E-filing

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name ___FELICIANO_____PEDRO_____
     (Last)        (First)        (Initial)

**FILED**

Prisoner Number ____C-59854_____

Institutional Address ___P.O. BOX 689, ZW-321L, SOLEDAD, CA 93960-0689___

SEP 1 3 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

PEDRO FELICIANO,
(Enter the full name of plaintiff in this action.)

    vs.

BEN CURRY, WARDEN, ET. AL.,

(Enter the full name of respondent(s) or jailor in this action)

**C 07 4713 CW**

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT OF HABEAS CORPUS (PR)**

Read Comments Carefully Before Filling In

<u>When and Where to File</u>

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

1 | Who to Name as Respondent

2        You must name the person in whose actual custody you are. This usually means the Warden or

3 jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7 but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9 was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11     1. What sentence are you challenging in this petition?

12         (a)    Name and location of court that imposed sentence (for example; Alameda

13               County Superior Court, Oakland):

14               SUPERIOR COURT             LOS ANGELES

15               Court                   Location

16         (b)    Case number, if known ___ SCR 39275

17         (c)    Date and terms of sentence ___ 1/27/83 - 27 YEARS TO LIFE

18         (d)    Are you now in custody serving this term? (Custody means being in jail, on

19               parole or probation, etc.)       Yes _X_    No ____

20               Where?

21               Name of Institution: ___ CTF-SOLEDAD

22               Address: ___ P.O. BOX 686, SOLEDAD, CA 93960

23     2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 challenging more than one sentence, you should file a different petition for each sentence.)

26   187 PC   AND   664/187 PC

27   FIRST DEGREE MURDER   AND   ATTEMPTED

28   MURDER

3. Did you have any of the following?

    Arraignment:                        Yes __X__       No _____

    Preliminary Hearing:             Yes __X__       No _____

    Motion to Suppress:             Yes _____       No __X__

4. How did you plead?

    Guilty _____    Not Guilty __x__   Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __X__    Judge alone_____   Judge alone on a transcript _____

6. Did you testify at your trial?          Yes _____     No __X__

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment             Yes __X__     No _____

    (b)    Preliminary hearing      Yes __X__     No _____

    (c)    Time of plea            Yes __X__     No _____

    (d)    Trial                   Yes __X__     No _____

    (e)    Sentencing             Yes __X__     No _____

    (f)    Appeal                 Yes __X__     No _____

    (g)    Other post-conviction proceeding   Yes _____     No __X__

8. Did you appeal your conviction?      Yes __X__     No _____

    (a)    If you did, to what court(s) did you appeal?

            Court of Appeal         Yes _____     No _____

            Year: _____     Result:_____

            Supreme Court of California    Yes _____     No _____

            Year: _____     Result:_____

            Any other court         Yes _____     No _____

            Year: _____     Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                          Yes _____      No_____

(c)    Was there an opinion?                       Yes _____      No_____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                                   Yes _____      No_____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?          Yes _____      No _X_

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: ____CALIFORNIA SUPREME COURT_____

       Type of Proceeding: _____HABEAS CORPUS_____

       Grounds raised (Be brief but specific):

       a._____SAME AS HERE_____

       b._____

       c._____

       d._____

       Result: _____DENIED_____Date of Result:__8/8/2007__

II.   Name of Court: ____CALIFORNIA COURT OF APPEAL_____

       Type of Proceeding: _____HABEAS CORPUS_____

       Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

ALL ORDERS ARE ATTACHED

a. ___SAME AS HERE_____

b. _____

c. _____

d. _____

Result: ___DENIED_____ Date of Result: 1/26/07

Name of Court: ___SUPERIOR COURT_____

Type of Proceeding: ___HABEAS CORPUS_____

Grounds raised (Be brief but specific):

a. ___SAME AS HERE_____

b. _____

c. _____

d. _____

Result: ___DENIED_____ Date of Result: 2/6/07

IV.  Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____   No  X

Name and location of court: _____

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1 | need more space. Answer the same questions for each claim.

2 |     [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3 | petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4 | 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5 |     Claim One:_____SEE ATTACHED_____

6 | _____

7 |     Supporting Facts:_____SEE ATTACHED_____

8 | _____

9 | _____

10 | _____

11 |     Claim Two:_____

12 | _____

13 |     Supporting Facts:_____

14 | _____

15 | _____

16 | _____

17 |     Claim Three:_____

18 | _____

19 |     Supporting Facts:_____

20 | _____

21 | _____

22 | _____

23 |     If any of these grounds was not previously presented to any other court, state briefly which

24 | grounds were not presented and why:

25 | _____

26 | _____

27 | _____

28 | _____

PET. FOR WRIT OF HAB. CORPUS      - 6 -

# TABLE OF CONTENTS

| TITLE | PAGE |
|---|---|
| Cover | 1 |
| Table of Contents | 2 |
| Points and Authorities | 3 – 4 |
| Judicial MC-275 | 5 – 19 |
|     Ground 1 | 7 – 14 |
|     Ground 2 | 15 – 18 |
| Conclusion | 20 |
| Prayer for Relief | 21 |
| Proof of Service by Mail | 22 |
| Exhibit 'A'<br>(Hearing Transcript 2004) | 23 – 68 |
| Exhibit 'B'<br>(Psychological Evaluation) | 69 – 73 |
| Exhibit 'C'<br>Life Prisoner Evaluation Report (LPER) | 74 – 85 |
| Exhibit 'D'<br>(Previous Decisions 1998, 2000 & 2002) | 85 – |

# TABLE OF AUTHORITIES

**AUTHORITY**                                           **PAGE**

## CONSTITUTIONAL AUTHORITIES

U.S. CONSTITUTION, AMENDMENT 7, 14                      5, 6, 9, 10, 11, 13, 14

CALIFORNIA CONSTITUTION, ARTICLE I, SECTIONS 7, 15      5, 6, 9, 10, 11, 13, 14

## FEDERAL CASE LAW

Biggs v. Terhune, (2003 9th Cir.)                       5, 6, 8, 9, 10
334 F.3d 910
Greenholtz v. United States                            10
(1987) 100 Cal.3d 794.
McQuillion v. Ducan, (9th Cir.)                         5, 6
306 F.3d 895

## STATE CASE LAW

California v. Morales, (1975)                           13, 14
115 S.Ct. 1597
In re Capistran, (2003)                                13, 14
107 Cal.App.4th 1299
In re Caswell, (10/10/01)                              13, 14
92 Cal.App.4th 1017
In re Jackson, (1985)                                 13, 14
39 Cal.App.3rd 464
In re Minnis,                                           6
7 Cal.3d at p. 647
In re Norman Morrall, (2002)                           5, 6, 8, 13, 14
102 Cal.App.4th 280
In re Edward Ramirez, (2001);                          5, 6, 9, 10 13, 14
94 Cal.App.4th 549
In re Rodriguez,                                       13, 14
(1975) 14 C.3d 639
In re Rosenkrantz (2002)                               5, 6
29 Cal.App.4th 659
In re Rosenkrantz,                                     13, 14
95 Cal.App.4th 358
In re George Scott                                     5, 8
119 Cal.App.4th
In re Mark Smith, (2003)                               5
Cal.App.4th 343

# TABLE OF AUTHORITIES PAGE 2

| PENAL CODE | PAGE |
|---|---|
| § 3000(b)(1) | 5 |
| § 3041(a) | 10, 11 |
| § 3041(b) | 5, 6 |
| § 3041.5 | 5, 6, 9 |
| § 3041.5(b)(2) | 13 |
| § 5076.2 | 13 |

## CALIFORNIA CODE of REGULATIONS

| CCR SECTION | PAGE |
|---|---|
| CCR § 2000(b) (48) [Good Cause] | 13, 14 |
| CCR § 2000(b) (61) [Material Evidence] | 13, 14 |
| CCR § 2000(b) (89) [Relevant Evidence] | 13, 14 |
| CCR § 2400 et seq. | 13, 14 |
| § 2282(a) | 8 |
| § 2402(a) | 6 |
| § 2402(c)(1)(D) | 8 |
| § 2403(c) | 6, 9 |
| § 3375.2(7)(A) | 8 |

THE BOARD OF PRISON TERMS ILLEGALLY USED PENAL CODE SECTION 3041(b) [THE EXCEPTION] TO FIND PETITIONER UNSUITABLE FOR PAROLE. AS THERE IS NOT A MODICUM OF EVIDENCE THAT PETITIONER IS A CURRENT THREAT TO SOCIETY OR OTHERWISE UNSUITABLE FOR PAROLE THE DECISION WAS ARBITRARY AND CAPRICIOUS VIOLATING PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS.

On AUGUST 31, 2005, Petitioner PEDRO FELICIANO, C-59854 (hereinafter "Petitioner"), was provided a Life Term Parole Consideration Hearing before the Board of Prison Terms (hereinafter "Board", "BPT", or "Panel"); Please refer to Exhibit 'A' which is the Hearing Transcript (hereinafter "HT" or "Transcript"). Said Hearing was Petitioner's FOURTH parole suitability hearing. Petitioner's Minimum Eligible Parole Date (hereinafter "MEPD"), was JUNE 16, 2000.[1] The purpose of this Board hearing was for the setting of Petitioner's term uniformly [2] to his offense and for a finding of suitability for parole (See Penal Code § 3041.5; In re Edward Ramirez, 94 Cal.App.4th 541 (2001); McQuillion v. Ducan, (9th Cir.) 306 F.3d 895; In re Norman Morrall, (2002) 102 Cal.App.4th 280; In re Rosenkrantz, (2002) 29 Cal.App.4th 660; In re Mark Smith, (2003) Cal.App.4th 343; and the recent Biggs v. Terhune, (2003 9th Cir.) 334 F.3d 910.

The result of this Board hearing was an erroneous and unlawful finding of unsuitability and a release date was not set. Instead, Petitioner was given a two (2) year denial and did not appeal this decision through the administrative remedy because the Board has eliminated the BPT Appeals Unit and no longer allows for the filing of administrative appeals on BPT denials

---

1 – The Court of Appeal in In re George Scott, (2004) 119 Cal.App.4th 871, reaffirmed the rationale of the Ramirez and Smith Courts when it declared "...parole is the rule, rather than the exception, and conviction for second degree murder does not automatically render one unsuitable. (In re Smith, (2003) 114 Cal.App.4th 343, 366). In re Ramirez, supra, 94 Cal.App.4th 549 ...[a]ll violent crimes demonstrate the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. Penal Code § 3000 subd. (b)(1).) And the Legislature has clearly expressed its intent that when murders – who are the great majority of inmates serving indeterminate sentences – approach their minimum eligible parole date, the Board shall normally set a parole release date..." (id. at p. 570).

2. – The Court of Appeal on June 24, 2004, in In re George Scott, supra, 119 Cal.App.4th at 887 fn. 7, also reaffirmed the Legislative Intent of Uniform terms by stating: "The first two sentences of the DSL declare 'that the purpose of imprisonment for a crime is punishment' and that [t]his purpose is best served by terms proportionate to the seriousness of the offense with provisions for uniformity in the sentences of offenders committing the same offense under similar circumstances. (Penal Code § 1170, subd. (a)(1).) Nothing in the DSL or its legislative history suggests that legislative concern with uniformity was limited to those serving determinate terms. Penal Code § 3041 shows that this interest does extend to individuals such as [this Petitioner] who are serving indeterminate life terms. (Id., citing Ramirez, supra 94 Cal.App.4th at 559).

of parole for indeterminately sentenced prisoners such as Petitioner. Petitioner submits that the Board's regulation, that is the California Code of Regulations (hereinafter "CCR"), § 2402(a) **DEMANDS** that the Board set a release date unless Petitioner **CURRENTLY** presents an **unreasonable risk of danger to the public**. Petitioner submits that the representing District Attorney did not provide any new and/or additional evidence whatsoever that Petitioner is an unreasonable risk of danger to the public or otherwise unsuitable for parole.

Additionally, Petitioner submits that the Board speaks in meaningless generalities and fails to address the exact nature of Petitioner's <u>CURRENT</u> character. By not doing so, the Board violated the intent and spirit of Penal Code (hereinafter "PC"), § 3041.5 [3] and <u>In re Ramirez</u>, supra, which dictates that the Board shall normally set a parole release date. (citing <u>Biggs v. Terhune</u>, supra).

The Court in <u>Biggs</u>, supra, held that the Board's continued use of the crime (or any other unchanging circumstances) as a basis for denial of parole when Petitioner's Institutional Behavior remains exemplary may be a violation of both State and Federal Due Process.

For the past ten (10) years, Petitioner has had no occurrence of serious or violent disciplinary action, thus exemplifying himself as a model prisoner. Petitioner seeks acknowledgment of the facts that since 1995, there has been thereafter a continuous ten (10) year history free of any disciplinary action or occurrence. Petitioner submits that the Board's failure to uniformly measure his offense and set his term proportionately to others similarly situated and to find him suitable for parole violates both State and Federal due Process. Also, the current policy of the Board, which will be discussed more fully infra, is the setting of a parole date which is all too often the exception rather than the norm, and thus violates Petitioner's Liberty Interest that is present in a parole date; <u>In re Rosenkrantz</u>, supra; <u>McQuillion v. Ducan</u>, supra; <u>Biggs v. Terhune</u>, supra. At the Petitioner's board hearing the

---

3 – There is no evidence that the crime is "particularly egregious" to justify the use of the exception clause of PC § 3041(b); <u>In re Norman Morrall</u>, supra, the court concluded "[W]e agree that an inmate cannot be denied parole simply on the type of offense he committed." (See also <u>In re Minnis</u>, 7 Cal.3d at p. 647). To the contrary, it falls squarely in the Board's own proportionality matrix CCR § 2403(c) at axis B-II. Without post-conviction credits Petitioner has served twenty two (22) years. Adding post conviction credits he has served twenty seven (27) plus years, essentially reaching his matrix as required. There is no evidence that Petitioner is a current risk or threat to society and the Board's conclusions are not supported by the record. (See <u>Biggs</u>, supra).

1  BPT relied solely on Petitioner's commitment offense and prior history to justify its unlawful

2  finding of unsuitability. Beginning at page 36 of Exhibit 'A', the HT, the Board stated:

3       "The offense was carried out in an exceptionally cruel and callous manner" (line 12-13)

4       "The offense was carried out in a dispassionate ...manner too." (lines 26)

5       "The offense was carried out in a manner that demonstrates an exceptionally callous

6       disregard for the safety of others." (37 lines 14-15)

7

8     In addition, and with regard to the Petitioner's suitability, the board erred in disregarding

9  Petitioner's Mental Health Evaluation which is supportive of release (please refer to HT

10 DECISION pg. 38 lines 22-24 line). Petitioner's Psychiatric Reports have been much

11 instructive. Specifically, Dr. J. Reed, Ph.D., CTF-Soledad, Staff Psychologist, stated:

12      "There is no evidence of a mood or thought disorder" (See Exhibit 'B' pg. 1,

13      Psychological Evaluation, Current Mental Status)

14      "He demonstrated empathy for the damage done to the victims, including his ex-wife,

15      her boyfriend, and his three children." (Id., Review of Life Crime, p. 2)

16      "He seems genuinely penitent for his crime and appears to understand the causative

17      factors leading to the instant offense." (Id., p. 2)

18      "He seems committed to never using violence to solve problems again." (Id., p. 2)

19

20 And under "Assessment of Dangerousness" Dr. J. Reed stated:

21      "His risk for violent behavior within a controlled setting is considered to be low

22      relative to this level II inmate population in a prison setting." (Id., p. 2)

23      "If released to the community, clinically assessed, his risk for violence is expected to

24      be average to that of the average citizen in the community." (Id., p. 3)

25      "There are no significant risk factors or precursors to violence for this individual."

26      (Id., p. 3)

27   Additionally, the Board ignored that Petitioner has been deemed by the California

28 Department of corrections a Model prisoner with A-1-A status, and Not a threat to society, and

1   that Petitioner's crime is not "particularly egregious" (especially cruel and callous) by placing

2   Petitioner in a Level II prison setting. [4]

3   Also, in the Life Prisoner Evaluation Report (hereinafter "LPER") attached as Exhibit 'C',

4   Petitioner's Correctional Counselor, CC-I Palmer, states:

6   "Based on the commitment offense, prior prison record, and prison adjustment,

7   FELICIANO would probably pose a low risk to the public, if released from

8   prison. FELICIANO has remained disciplinary free since 1984. He has been an

9   active participant in self help and therapy programs throughout the year of 1999

10   and 2002. FELICIANO received a recent NA/AA laudatory chrono dated

11   2/22/2004 for showing his ability to comprehend all aspects of the Twelve Step

12   Program. FELICIANO also has learned a trade in upholstery while in prison

13   and would like to pursue his trade as possible employment. This writer believes

14   that FELICIANO has shown positive programming adjustment while in prison

15   and deserves consideration for parole." On Page 6, CCI Palmer, documents that

16   FELICIANO attended a Millati Islamic 12 week (Path to Peace) Anger

17   Management program (2/20/02) and also a Life Skills program (8/25/99). O n

18   2/25/02 he also attended a 9 week Impact Program. (Exhibit 'C' p. 7)

21   Again, in In re Norman G. Morrall, supra, the Court concluded; "A refusal to consider the

22   particular circumstances relevant to an inmate's individual suitability for parole would be

23   contrary to law." Moreover, the Court in Biggs, supra, addressed the Board's continued illegal

24   use of the crime and/or prior history to justify a denial of parole:

25   4. California Code of Regulations, Title 15, section 3375.2 subd. (7)(A) states: "An inmate serving any life term
    shall not be housed in a Level I or II facility if any of the following case factors are present: The Commitment
26   Offense involved... unusual violence...." And on June 24, 2004, the Court of Appeal in In re George Scott, supra,
    119 Cal.App.4th at 892 fn. 11, found that the Board's regulations provide that even if the crime is "exceptionally
27   callous" an inmate may be found suitable for parole. The Court declared that "Under the Board regulations, base
    terms for life prisoners are not calculated until after an inmate is deemed suitable for release. (§ 2282, subd. (a).)
28   The regulations therefore contemplate that an inmate may be deemed suitable for release even though his offense
    demonstrated "exceptionally callous disregard for human suffering." (§ 2402, subd. (c)(1)(D).)" (Id)

"... a continued reliance... on an unchanging factor, the circumstances of the

offense and conduct prior to imprisonment, runs contrary to the rehabilitative

goals espoused by the prison system and could result in a due process violation".

(Biggs, supra, 334 F.3d at 917).

In Biggs, supra, the appeal was pursuant to his initial suitability hearing. The Petitioner has now had FOUR Board hearings and submits that his most recent denial rests solely on the commitment offense, (as did his previous hearings in 1998, 2000, and 2002, included herein as Exhibit 'D''), and therefore violates both State and Federal Due Process. Most importantly, there is no evidence that the public safety requires a lengthier period of incarceration (please refer to PC § 3041 (b)), in relation to other instances of the same crime please refer to PC § 3041.5.

Petitioner submits that understanding and perspective of the crime is compelled by the Board's own proportionality matrix (please refer to CCR Division 2, § 2403(c). The matrix scale and rating of the more common and routine variations of murder appear to a codification of when a crime of this nature can be more egregious than average.

Petitioner submits that his crime falls squarely in the matrix [category NONE, 19-20-21 years]. With post conviction credits, Petitioner has exceeded the maximum by more than five (5) years and without post conviction credit application, Petitioner has served his matrix. The Board fails in any attempt to substantiate why Petitioner's crime is so heinous as to require that Petitioner be exempted time and time again from the general rule that a parole date shall normally be set; please see In re Ramirez, supra, wherein the court states:

"The Board must weigh the inmate's criminal conduct not against ordinary

social norms, but against other instances of the same crime or crimes. (Ramirez,

supra, Cal.App.4th at p. 570).

Petitioner submits that the record is devoid of the Board making such a comparison. Similarly, Petitioner's Psychiatric Report evidence, like Biggs, supra, is supportive of release; contrary to the Board's erroneous and specious findings (please see Exhibit 'A' and 'B'). The court in Biggs, addressed the Board's illegal usage of needed therapy and other illegal reasons

to justify a highly illegal denial. the Court concluded:

> "The record in this case and the transcript of Biggs' hearing before the Board
> clearly show that <u>many of the conclusions and factors relied upon by the Board
> were devoid of evidentiary basis.</u>" (<u>Biggs</u>, supra, 334 F.3d at p. 915)

The Court in <u>Biggs</u>, supra, went on to warn the Board that while there was "some evidence" to use the crime as a basis for denial at his <u>initial</u> hearing, the board's continued use of the crime as a basis for continual denials would be a violation of Biggs Federal due process rights. Petitioner submits that the Board's <u>sole</u> usage of the initial commitment offense and/or prior social history, on a continual basis to deny him a parole date has violated his 5th and 14th Amendment rights under the United States Constitution to not be deprived of his liberty.

> "[T]o ensure that a state created parole scheme serves the public interest
> purposes of rehabilitation and deterrence, the Parole Board must be cognizant
> not only of the factors required by the state statute to be considered. but also the
> concepts embodied in the <u>Constitution</u> requiring <u>due process of law</u>... "[Please
> see e.g. in <u>Greenholtz</u>, 442 U.S. at 7-8.]." (<u>Biggs</u>, supra, 334 F.3d at p. 916)

> "The Parole Board's sole supportable reliance on the gravity of the offense and
> conduct prior to imprisonment to justify denial of Parole can be initially justified
> as fulfilling the requirements set forth by state law. Over time however, should
> Biggs continue to demonstrate exemplary behavior and evidence of
> rehabilitation, <u>denying him a parole date simply because of the nature of his
> offense and prior conduct would raise serious questions involving his liberty
> interest in parole</u>...(Id)

Petitioner also submits that the Board has adopted an anti and/or no parole policy per se, or a policy of under-inclusion demonstrating a policy of systematic bias; granting only an approximate 232 parole dates out of over 11,000 parole hearings, thus violating the legislative intent of PC § 3041(a) that; "...a parole date <u>shall normally</u> be set in a manner that will provide <u>uniform</u> terms for offenders with crimes of similar gravity and magnitude...". And, violating

1  Petitioner's State and Federal due process rights as well (please see <u>In re Ramirez</u>, supra, at

2  page 565). Petitioner contends that the evidenced behavior by a quasi-judicial Board, of a

3  policy demonstrating an approximate 98.5% denial rate, supports the premise that such a policy

4  exists (i.e. anti and/or no parole policy of under-inclusion or systematic bias): this policy

5  violates the strictures of substantive due process.

6      The existence of said policy in denying parole may explain why the Board only grants

7  parole in less than two (2) percent of the cases it hears; it also explains the bias demonstrated in

8  the present case.

9      In this case, Petitioner's own circumstances, the Board's pronouncement of numerous

10 unlawful conclusions, not supported by the record, violates the process due to Petitioner under

11 the State and Federal Constitutions. Based upon the herein-demonstrated bias, the Board's

12 decision cannot be shielded by the "some evidence" standard. The only appropriate remedy is

13 an independent review.

14 //

15 //

16 //

17

18

19

20

21

22

23

24

25

26

27

28

PETITIONER'S RIGHT TO HAVE SEPARATELY STATED AND SPECIFICALLY DIRECTED (SEPARATE AND DISTINCT) REASONS WHEN GIVEN A MULTI-YEAR DENIAL WAS NOT PROTECTED BY THE BPT IN VIOLATION OF HIS STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS PROTECTIONS AND CONTRADICTORY OF THE LEGISLATIVE INTENT OF PENAL CODE § 3041.5(b)(2).

1. The statement of reasons for a multi-year denial must be a separate and distinct statement that is not a mere recital of the same reasons used to deny parole worded slightly differently.

2. In denying Petitioner parole for a period of two (2) years, the BPT failed to cite its reasons for a multi-year denial.

3. The BPT's stated reason for parole denial was:

    "The offense was carried out in an especially cruel and callous manner. On June 15, 1982, Mr. Rodriguez and Ms. Hernandez, the estranged wife of Pedro Feliciano, pulled up in front of his apartment. There was a conversation, Mr Feliciano went inside of his apartment came out – or came into the doorway brought a rifle a .22 Caliber automatic rifle from his house, stood in the doorway fired two to four shots in the direction of the victim striking Rodriguez in the neck and Mrs. Hernandez – Ms. Hernandez, his estranged wife, in the head. Subsequently, Mr. Rodriguez was injured – was able to drive away out of harm's way and Ms. Hernandez was pronounced dead at the Loma Linda Medical Center. That's particularly callous and was clearly carried out in a dispassionate calculated manner." (Exhibit 'A' p. 36)

4. The BPT's stated reason for a multi-year denial was:

    NOT GIVEN.

5. A multi-year denial can only be applicable when valid grounds exist to find Petitioner unsuitable for parole. Petitioner has adequately established in his argument ante that the BPT's reasoning for denying parole was unsubstantiated, lacking even "some evidence" that he is <u>CURRENTLY</u> an unreasonable risk to the public and was therefore arbitrary, capricious, lacked basis in fact, and/or was contrary to law.

**Supporting cases:**

"If the Legislature had intended a single statement of reasons to suffice for both the refusal to set a parole date and the decision to postpone annual review, it would not have enacted language specifically calling for a statement of reasons on the latter...Accordingly, this Court holds the Board to the Legislative requirement that its reasons for postponing a suitability hearing be separately stated and specifically directed to that question." In re Jackson, (1985) 39 Cal.App.3d 464

Penal Code § 3041.5(b)(2) that requires a separate and distinct statement that is not a mere recital of the same reasons used to deny parole worded slightly differently.

Penal Code § 5076.2

CCR § 2000(b) (48) [Good Cause]; (61) [Material Evidence]; [Relevant Evidence]

CCR § 2400 et seq.

California Constitution Article I §§ 7, 15 [Due Process]

U.S. Constitution Amendment 14 [Due Process]

In re Capistran, (2003) 107 Cal.App.4th 1299

In re Morrall, 102 Cal.App.4th 280

In re Rosenkrantz, 95 Cal.App.4th 358

In re Ramirez, 94 Cal.App.4th 549

In re Caswell, (10/10/01) 92 Cal.App.4th 1017

In re Rodriguez, (1975) 14 C.3d 639

California v. Morales, (1975) 115 S.Ct. 1597

//

//

//

## CONCLUSION

The Board's decision was arbitrary and capricious. The Petitioner did not receive a fair hearing, nor will he ever.

Petitioner submits and contends that the finding of unsuitability was arbitrary and capricious:

1). Due to the Board carrying out it's political function of adhering to a no or anti-parole policy;

2). Due to the Board's acting contrary to the intent and spirit of PC § 3041 (a);

3). Due to basing its decisions on unsupported allegations; and

4). Due to the Board's refusal to adhere to aforementioned decisions and the controlling authorities.

Petitioner prays this Court order him released and /or discharged, or at the very least, direct the Board to issue a decision within ten (10) days granting parole, setting his term "uniformly" as mandated by the legislature.

//

//

//

## PRAYER FOR RELIEF

1. Issue an Order to Show Cause on an expedited basis.

2. Appoint Counsel.

3. Conduct an Evidentiary Hearing.

4. Order Petitioner's appearance before the Court.

5. Order Petitioner taken back before the Board for a finding of suitability within ten (10) days, or in the alternative, order Petitioner released forthwith;

6. Declaratory relief, and

7. Any other relief this Court deems fair, just and appropriate.

1    List, by name and citation only, any cases that you think are close factually to yours so that the

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasonin

3    of these cases:

4    _____

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____    No_X___

8    If you do, give the name and address of your attorney:

9    I AM REQUESTING APPOINTMENT OF COUNSEL._____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on *September 6, 07*                    _____

14                    Date                                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS            - 7 -

## PROOF OF SERVICE BY MAIL

### BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _____PEDRO FELICIANO_____, declare:

I am over 18 years of age and a party to this action.  I am a resident of _____

_____CORRECTIONAL TRAINING FACILITY-SOLEDAD_____Prison,

in the county of _____MONTEREY_____

State of California.  My prison address is: _____

_____P.O. BOX 689, ZW-321L, SOLEDAD, CA 93960-0689_____

On_____
(DATE)

I served the attached: _____PETITION FOR HABEAS CORPUS_____

_____
(DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined.  The envelope was addressed as follows:

OFFICE OF THE ATTORNEY GENERAL
110 WEST A STREET, #11000
SAN DIEGO, CA 92186

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on ___9/6/07___
(DATE)

_____
(DECLARANT'S SIGNATURE)

Civ-69 (Rev. 9/97)

::ODMA\PCDOCS\WORDPERFECT\22832\1

-9-

S150495

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re PEDRO FELICIANO on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

AUG – 8 2007

Frederick K. Ohlrich Clerk

DEPUTY

**GEORGE**

Chief Justice

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO



JAN 2 6 2007

COURT OF APPEAL FOURTH DISTRICT

## **ORDER**

In re

PEDRO FELICIANO

on Habeas Corpus.

E042143

(Super.Ct.Nos. SCR39275 &
SWHSS8514)

The County of San Bernardino

THE COURT

The petition for writ of habeas corpus is DENIED.

KING

Acting P.J.

cc:     See attached list



## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF SAN BERNARDINO

ACIS Case No.:

JUDGE:  BOB N. KRUG

DATE: February 6, 2006

CASE NO.:SWHSS – **8514**

CLERK: V. GAYTON

COUNSEL:

DEPT.: S-16

BAILIFF: --

CASE TITLE:     In the Matter of the Application of
**PEDRO FELICIANO**
on Habeas Corpus

NATURE OF PROCEEDINGS:

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

MINUTE ORDER:

The court has received, read and considered the Petition for Writ of Habeas Corpus filed by the Petitioner on November 29, 2005; the Informal Response filed by the Respondent on January 3, 2006; and the Informal Reply filed by the Petitioner on January 19, 2006.

The Petitioner has filed this Petition for Habeas Relief from the finding of the Board of Parole hearings on August 31, 2005 that he was not suitable for parole. Apparently, the Petitioner was convicted in 1983 of the crime of murder, a violation of Penal Code § 187(a), with a gun enhancement and attempted murder, Penal Code § 664/187. The Petitioner was sentenced to State Prison for a period of twenty-seven (27) years to life. He was received at the institution on January 27, 1983 and his minimum eligibility parole date was set at June 16, 2000. The Petitioner had appeared before the Board, at least on three prior occasions and was denied a finding of suitability.

A review of the Board proceedings reveals that on June 15, 1982, the Colton Police responded to a "shots fired" call. There investigation revealed that the Petitioner's estranged wife had gone to Petitioner's residence to see her children. She had been driven to the residence by her then current boyfriend, a Mr. Rodriguez. The Petitioner approached the vehicle and told Mr. Rodriguez "take out the rifle". Petitioner was informed that Mr. Rodriguez did not have a rifle. The Petitioner then obtained a firearm from his house and shot at the vehicle containing Mrs. Hernandez, and Mr. Rodriquez. He hit Mr. Rodriguez in the neck and Mrs. Hernandez in the head. Mr. Rodriguez was able to drive away and contact the police. Mrs. Hernandez was pronounced dead at the hospital. Petitioner was arrested that same evening. The Petitioner's version differed substantially from the above facts.

The Petitioner contends in his Petition that the Board erred by illegally using Penal Code § 3041(b) to find him unsuitable and that the Board did not state specific, separate, and distinct reasons for setting a multi-year denial. The Petitioner's contentions are without merit.

The court has reviewed the record of proceedings before the Board of Parole Hearings on August 31, 2005 and finds that the Board considered each and every element or criteria it is required to consider in making the findings as set forth in In re RosenKrantz 29 Cal. 4th 616.

The last and most definitive word on the area of law controlling judicial review of Board of Parole Hearing decisions denying a finding of suitability for parole was made by the Supreme Court in In re Rosenkrantz, supra, and in In re John E. Dannenberg 34 Cal. 4th 1061.

Penal Code Section 3041(b) provides for parole review of inmates such as Petitioner and further provides that such inmates shall be given a release date unless the Board determines that the gravity of the current convicted offense is such that consideration of the public safety requires a more lengthy period of incarceration. California Code of Regulations, Title 15, Section 2402(a)(b)(c)(d) sets forth the rules by which the Board is to make its determination. As stated by the Court, parole applicants have an expectation of being granted parole unless the Board finds in the exercise of its discretion that the applicant is unsuitable. The operative words are "in the exercise of its discretion". Judicial review of this discretion is limited only to a determination of whether there is "some evidence" in the record to support the decision. As held by the Court, this standard of "some evidence" is extremely deferential.

The reviewing court is prohibited from conducting and independent assessment of merits or considering whether substantial evidence supports the findings of the Board and its underlying decision. The Board is required to consider the Petitioner's background, his institutional participation, post-parole plans, as well as the psychological evaluations. The High Court held, however, that the nature of the inmate's offense, alone, could constitute a sufficient basis for denying parole. This does not permit the paroling authority to automatically exclude parole for individuals who have been convicted of a particular type of offense.

A review of the record supports a finding that there was "some evidence" which led the Board to its finding of unsuitability of the Petitioner for parole, for as the High Court described such evidence, it need be only a "modicum" of evidence.

The Board did consider the positive factors which favored parole and made its finding that these did not outweigh the factors surrounding the circumstances of the crime. While the decision did not reflect the weighing process of the Board, the Rosenkrantz Court, at page 677, clearly states that the Board need not explain its decision or the precise manner in which the specific facts were relevant to parole suitability. This consideration and balancing lie within the discretion of the Board.

The decision of the Board adequately stated the reason for the two year denial.

The Petition for Writ of Habeas Corpus denied.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN BERNARDINO, CENTRAL DISTRICT

TITLE OF CASE (ABBREVIATED):  In the Matter of the Application of
**PEDRO FELICIANO**
on Habeas Corpus

CASE NUMBER:  SWHSS – **8514**

## DECLARATION OF SERVICE BY MAIL

My business address is: San Bernardino Superior Court, 351 N. Arrowhead Avenue, San Bernardino, California 92415.

I hereby declare that I am a citizen of the United States, over the age of 18, employed in the above-named county, and not a party to nor interested in this proceeding. On _____ February 6, 2006 _____, I deposited in the United States mail at San Bernardino, California, a sealed envelope (postage prepaid) which contained a true copy of the attached:

NAME OF DOCUMENT:

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

which was addressed as follows:

**Name and Address of Persons Served:**

Pedro Feliciano, C-59854
Z-321-L
P.O. Box 689
Soledad, CA 93960-0689

Bill Lockyer,  Attorney General
State of California
P.O. Box 85266
San Diego, CA  92186-5266

(Together with copy of Minute Order)

At the time of mailing this notice there was regular communication between the place of mailing and the place(s) to which this notice was addressed.

I declare under penalty of perjury the foregoing to be true and correct.

DATED: _____ February 6, 2006 _____          by _____

Mary Jo Phipps
Judicial Secretary

EXHIBIT A
(HEARING TRANSCRIPT)

DEPARTMENT PAROLE          CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life
Term Parole Consideration
Hearing of:

PEDRO FELICIANO

CDC Number C-59854

# INMATE
# COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 11, 2005

8:47 a.m.

PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
DOUG FILANGERI, Deputy Commissioner

OTHERS PRESENT:

PEDRO FELICIANO, Inmate
DAVID SPOWART, Attorney for Inmate
JOSE ZEBALE, Interpreter for Mr. Feliciano
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Felicia Townsend, Peters Shorthand Reporting

INDEX

                                                          PAGE

Proceedings....................................... 3

Case Factors...................................... 10

Pre-Commitment Factors............................ 14

Post-Commitment Factors........................... 23

Parole Plans...................................... 18

Closing Statements................................ 28

Recess............................................ 35

Decision.......................................... 36

Adjournment....................................... 44

Transcriber Certification......................... 45

--oOo--

P R O C E E D I N G S

DEPUTY COMMISSIONER FILANGERI:   We're on

3   record.

4             PRESIDING COMMISSIONER SAWYER:   We're going?

5             DEPUTY COMMISSIONER FILANGERI:   Yes.

6             PRESIDING COMMISSIONER SAWYER:   Okay.  Thank

7   you.  This is the subsequent parole consideration

8   hearing for Pedro Feliciano, F-E-L-I-C-I-A-N-O, CDC

9   number C, as in Charles, 59854.  Today's date is

10  August 31, 2005.  The time is 8:47 a.m.  We're at CTF

11  Soledad.  The inmate was received on 1/27 of 1983

12  committed from San Bernardino County.  Life term began

13  on 1/27 of 1983, and the inmate's minimum eligible

14  parole date was 6/16/2000.  Controlling offense for

15  which the inmate has been committed for is set for in

16  case number SCR, Sam, Charles, Robert, 39275.

17  Charging count one of 187 of the penal code first --

18  murder in the first degree with a weapon, rifle, and

19  the second count of 187, 664 attempted murder, also

20  with a rifle.  Mr. Feliciano received a term of 27

21  years to life.  This hearing is being tape recorded,

22  and for the purpose of voice identification, each of

23  us is required to state our first and last name,

24  spelling our last name.  When it comes to inmate, he

25  needs to state his first and last name, spell his last

26  name and give us his CDC number.  I'll start and go to

27  my left.  Tom Sawyer, S-A-W-Y-E-R, Commissioner.

1          DEPUTY COMMISSIONER FILANGERI: Deputy

2   Commissioner Doug Filangeri, F-I-L-A-N-G-E-I-I.

3          ATTORNEY SPOWART: David Spowart, S-P-O-W-A-

4   R-T, Attorney for Mr. Feliciano.

5          INMATE FELICIANO: Feliciano Pedro, F-E-L-I-

6   C-I-A-N-O, C-59854.

7          INTERPRETER ZEBALE: Jose Zabale, Z-A-B-A-L-

8   E, Spanish interpreter for Mr. Feliciano.

9          PRESIDING COMMISSIONER SAWYER: Thank you.

10  We also have two correctional peace officers in the

11  room for security purposes. Could I get -- could you

12  turn the air conditioner down one notch?

13         UNKNOWN SPEAKER: Yeah.

14         PRESIDING COMMISSIONER SAWYER: Thank you.

15  Thank you very much. The record reflects that Mr.

16  Feliciano signed a DPT Form 1073, which is an

17  reasonable accommodation notice in accordance with the

18  provisions of the American's With Disability Act.

19  This was signed -- what is the date on that Mr.

20  Feliciano that you sign it?

21         INMATE FELICIANO: 4/20.

22         PRESIDING COMMISSIONER SAWYER: 4/20, of

23  what year?

24         INMATE FELICIANO: '04.

25         PRESIDING COMMISSIONER SAWYER: '04. Okay.

26  It indicates on the form that you do not have any

27  disabilities defined under ADA, is that true?

INMATE FELICIANO:  Yes.

PRESIDING COMMISSIONER SAWYER:  I want to make a note for the record that Mr. Feliciano is wearing glasses.  Do you need those to read, sir?

INMATE FELICIANO:  Yes.

PRESIDING COMMISSIONER SAWYER:  Okay.  Do you have any trouble hearing?

INMATE FELICIANO:  No.

PRESIDING COMMISSIONER SAWYER:  No trouble hearing.  Any -- you have no disabilities according to your form; is that correct?

INMATE FELICIANO:  Yes, sir.

PRESIDING COMMISSIONER SAWYER:  Okay.

DEPUTY COMMISSIONER FILANGERI:  Speak up, sir?

INMATE FELICIANO:  Yes.

PRESIDING COMMISSIONER SAWYER:  Thank you. The only indication on that form is that you indicated that -- or the counselor whoever filled that out indicated that you need an interpreter for this -- for this hearing?

INMATE FELICIANO:  Yes.

PRESIDING COMMISSIONER SAWYER:  Okay.  How -- how is your English, sir?  Do you speak?

INMATE FELICIANO:  No.  Not too much English.

PRESIDING COMMISSIONER SAWYER:  Not too

1    much. Okay. All right. So you can understand some

2    English, but you do have an interpreter?

3                INMATE FELICIANO: Yes.

4                PRESIDING COMMISSIONER SAWYER: Okay, very

5    good. Can I get the form back, please? Thank you

6    very much.

7                DEPUTY COMMISSIONER FILANGERI: Mr. Sawyer?

8                PRESIDING COMMISSIONER SAWYER: Yes.

9                DEPUTY COMMISSIONER FILANGERI: I saw

10   something in an old Chrono about -- a comment about a

11   defective eye --

12               INMATE FELICIANO: Yes.

13               DEPUTY COMMISSIONER FILANGERI: -- that was

14   causing you pain?

15               INMATE FELICIANO: Yes.

16               DEPUTY COMMISSIONER FILANGERI: Can you

17   elaborate on that, please?

18               INMATE FELICIANO: Yes. I got this Chrono.

19   I took to the doctor eyes about one month ago, and he

20   said he not keep a Chrono about how his license to

21   keep a Chrono of it in this place and he know what my

22   problem because my problem is the blood is coming

23   inside my eyes.

24               DEPUTY COMMISSIONER FILANGERI: Can you see

25   through both eyes?

26               INMATE FELICIANO: Not too good. When I

27   take my glasses off, I see a little bit.

1              DEPUTY COMMISSIONER FILANGERI:  But you have

2    vision in both eyes?

3              INMATE FELICIANO:  Yeah.

4              DEPUTY COMMISSIONER FILANGERI:  Do you have

5    pain in your eyes?

6              INMATE FELICIANO:  Yeah, sometimes pain

7    (indiscernible)

8              INMATE FELICIANO THROUGH INTERPRETER ZEBALE:

9    I have like a burning sensation in my eye.

10             DEPUTY COMMISSIONER FILANGERI:  Are you

11   having that today?

12             INMATE FELICIANO:  No, no.

13             DEPUTY COMMISSIONER FILANGERI:  Thank you

14   Commissioner.

15             PRESIDING COMMISSIONER SAWYER:  Okay.  Thank

16   you very much.  Counsel, I'm satisfied he understands

17   the form.

18             ATTORNEY SPOWART:  Okay.

19             PRESIDING COMMISSIONER SAWYER:  We'll waive

20   reading.

21             ATTORNEY SPOWART:  Okay.  Thank you.

22             PRESIDING COMMISSIONER SAWYER:  This hearing

23   is being conducted pursuant to Penal Code Sections

24   3041 and 3042 and the Rules and Regulations of the

25   Board of Prison Terms governing parole consideration

26   hearings for life inmates.  The purpose of today's

27   hearing is to consider your suitability for parole.

1    In doing so, we will consider the number and nature of
2    the crimes that you are committed for, your prior
3    criminal and social history and your behavior and
4    programs since your commitment.  We've had an
5    opportunity to review your Central File and your prior
6    hearing transcript.  You'll be given an opportunity to
7    correct or clarify the record.  We will consider your
8    progress since your commitment and since your last
9    hearing.  Your updated counselor's report and your
10   psychological report will also be considered.  Any
11   change in your parole plans should be brought to our
12   attention.  Do you understand?

13            **INMATE FELICIANO:**  Yes.

14            **PRESIDING COMMISSIONER SAWYER:**  We will
15   reach a decision today in inform you whether or not we
16   find you suitable for parole and the reasons for our
17   decision.  If you are found suitable for parole the
18   length of your confinement will be explained to you.
19   This hearing will be conducted in two phases.  I will
20   discuss with you the crime that you are committed for,
21   your pyre criminal and social history, your parole
22   plans and any letters of support of opposition that ma
23   be in your file.  Deputy Commissioner Filangeri will
24   discuss with you your progress since your commitment,
25   your Counselor's report, and your psychological
26   evaluation.  Once that is concluded, commissioners,
27   district attorney, if one shows up, and your attorney

1    will be given an opportunity to ask you questions.
2    The questions from the district attorney should be
3    asked through the chair and the answers will be
4    directed back to the panel.  Before we recess for
5    deliberation, your attorney and you will be given an
6    opportunity to make a final statement regarding your
7    parole suitability.  Your statements should be
8    directed to as why you feel you are suitable for
9    parole.  When -- we will then recess, clear the room,
10   and deliberate.  Once we've completed our
11   deliberation, we will resume the hearing and announce
12   our decision.  The California Code of Regulations
13   states that regardless of time served a life inmate
14   shall be found unsuitable for or denied parole if in
15   the judgment of the panel the inmate would pose an
16   unreasonable risk of danger to society if released
17   from prison.  You have certain rights.  Those rights
18   include a right to a timely notice of this hearing,
19   the right to he view your Central File, and the right
20   to present relevant documents.  Counsel, have these
21   rights been met?
22             ATTORNEY SPOWART:  Yes, they have.
23             PRESIDING COMMISSIONER SAWYER:  You also
24   have the right to be heard by an impartial panel.  Any
25   objection to this panel?
26             ATTORNEY SPOWART:  I have none.
27             PRESIDING COMMISSIONER SAWYER:  You will

1    receive a copy of our written tentative did .is    oay.
2    That decision is subject to review by the Depus. :
3    Review Unit and by the entire Board meeting as : body.
4    It will become effective within 120 days. It -- it is
5    about subject to review by the Governor. A copy of
6    the tentative decision and a copy of the transcript
7    will be sent to you. As of May 1, 2004, there were
8    minor -- major changes limiting your former right to
9    appeal Board decisions or actions directly to the
10   Board.  The old Board regulations were repealed.
11   Current policy is entitled administrative appeals
12   correspondents and grievances concerning the Board of
13   Prison Terms decisions and is available at the prison
14   law library.  You are not required to omit -- admit
15   you're offense or discuss your offense if you do not
16   wish to, however, this panel does accept true to
17   findings of the court and you are invited to discuss
18   the facts and the circumstances of the offense if you
19   desire.  The Board will review and consider any prior
20   statements you've made regarding the offense in
21   determining your suitability for parole.  Deputy
22   Commissioner, is there any confidential material that
23   will be used in today's hearing?
24            **DEPUTY COMMISSIONER FILANGERI:** No, there's
25   none.
26            **PRESIDING COMMISSIONER SAWYER:** Okay.
27            **ATTORNEY SPOWART:** Excuse me, Commissioner,

1   I would like to ask my client?

2          **PRESIDING COMMISSIONER SAWYER:**  Certainly.

3   We have an understanding?

4          **INMATE FELICIANO:**  Yes.

5          **PRESIDING COMMISSIONER SAWYER:**  Do you

6   understand what -- what I'm talking about?

7          **INMATE FELICIANO:**  Yes, sir.

8          **PRESIDING COMMISSIONER SAWYER:**  Okay and any

9   time if you -- if you have a question of me or the

10  Deputy Commissioner, please feel free to ask it

11  directly or through your interpreter or through your

12  attorney, okay.  I have a hearing checklist.  I'm

13  going to pass it to the defendant's attorney.  If

14  you'd check that against your documents.

15         **ATTORNEY SPOWART:**  Yes, I have these.

16         **PRESIDING COMMISSIONER SAWYER:**  Are there

17  any additional documents to be submitted?

18         **ATTORNEY SPOWART:**  No.  Right at this time,

19  no.

20         **PRESIDING COMMISSIONER SAWYER:**  Okay.  Are

21  there any preliminary objections, Counsel?

22         **ATTORNEY SPOWART:**  I have none.

23         **PRESIDING COMMISSIONER SAWYER:**  Will the

24  inmate be speaking to the panel?

25         **ATTORNEY SPOWART:**  Everything -- he doesn't

26  wants to talk about the life crime.

27         **PRESIDING COMMISSIONER SAWYER:**  He doesn't.

1  Okay.

2          **PRESIDING COMMISSIONER SAWYER:**  Okay.  But

3  he will talk to us regarding other issues.

4          **ATTORNEY SPOWART:**  Yeah.

5          **PRESIDING COMMISSIONER SAWYER:**  Okay.  Mr.

6  Feliciano, would you raise your right hand.  Okay.  Do

7  you solemnly swear or affirm that the testimony you're

8  about to give in this hearing will be the truth, the

9  whole truth, and nothing but the truth?

10         **INMATE FELICIANO:**  Yes.

11         **PRESIDING COMMISSIONER SAWYER:**  Thank you.

12  As you know, Mr. Feliciano, this is being tape

13  recorded, so if we could move that a little to you.

14  You're a soft-spoken guy.  I don't want you to have to

15  tell, but we want to make sure that everything gets

16  onto the record, okay.  Thank you.  Okay.  I'm going

17  to inquire into the facts of the crime.  I'm using the

18  August '04, calendar of the Board Report page one,

19  Summary of the Crime.

20         On June 15, 182 at approximately

21         8:18 p.m. officers from the Colton

22         Police Department responded to East

23         Congress Street in Colton to call

24         shots fired.  Subsequent

25         investigation revealed that

26         Feliciano -- Feliciano's estranged

27         common-law wife Lazarra  -- is that

1    COMMISSIONER

2    INMATE FELICIANO:  Lazarra.

3    PRESIDING COMMISSIONER SAWYER:

4    L-A-Z-A-R-R-A, Hernandez, H-E-R-N-A-

5    N-E-L -- H-E-R-N-A-N-D-E-Z, victim,

6    went to his residents in order to

7    see her three children.  She was

8    driven to the house by her boyfriend

9    of two months, Pedro Rodriguez, R-O-

10   D-R-I-G-U-E -Z.  While still in the

11   vehicle, they were approached by

12   Feliciano, who advise Rodriguez to

13   quote, " take out the rifle" end

14   quote, because he was going to

15   obtain one.  Mr. Hernandez then

16   informed Feliciano that Mr.

17   Rodriguez did not have a rifle.

18   Feliciano obtained a 22 caliber

19   automatic rifle from his home --

20   from his house, stood in the

21   driveway -- stood in the area of the

22   doorway and fired two to four shots

23   in the direction of the vehicle

24   striking Rodriguez in the neck and

25   Ms. Hernandez in the head.

26   Rodriguez was able to drive the

27   vehicle away from the area and made

```
 1          contact with police.  Bot      ims
 2          received emergency medica.      and
 3          shortly there after Ms. Her  nez
 4          was pronounced dead at Loma  inda
 5          Medical Center.  Felician.  .
 6          arrested at his residents a
 7          approximately 8:33 p.m.
 8    This was information that was that was taken directly
 9    from the Probation's Officer's Report   The prisoner's
10    version of this crime is after interviewing Feliciano
11    for this report, he at a timed that his version
12    remains the same as written in the January 1998
13    report.   The report reads as follows:
14          Feliciano stated that he never told
15          Rodriguez to take out the rifle.   He
16          stated that when Rodriguez pulled up
17          in his car, he parked right in front
18          of Feliciano's apartment.  He told -
19          - he told Feliciano that Ms. -- Ms.
20          Hernandez wanted her children back.
21          Feliciano told him that he would not
22          give up the children and told
23          Rodriguez to move his car from in
24          front of his apartment.  He claimed
25          that he told Rodriguez to move his
26          car from in front of his apartment.
27          It's redundant.  He claimed that he
```

```
1              -- that he told Rodriguez that Mrs.
2              Hernandez could go to the end of the
3              apartment to see her children.  Then
4              he said that Rodriguez refused to
5              move his car so Feliciano went to
6              his apartment, got a 22. Caliber
7              rifle.  It says that he stood in his
8              doorway.  He saw Rodriguez reach
9              down.  He thought Rodriguez was
10             reaching for a relationship, so he
11             claims he fired two rounds not ·
12             knowing his common-law wife was
13             still in the car.  He did not
14             believe at first that he had killed
15             -- sorry.  I'll back up.  He claims
16             that even when he was arrested, he
17             did not believe at fist that he
18             killed Mrs. Hernandez.  He said he
19             felt badly and was concerned because
20             he knew he was going to jail and
21             that nobody -- and would be nobody
22             to take care of his children.  He
23             said he didn't have any problems
24             with his ex-common law wife and
25             never intended to kill her.
26    There's an indication here of aggregating factors:
27             The victim was particularly Von
```

```
 1              rabble inside the vehicle when
 1              Feliciano opened fire with a 22.
 1              Caliber automatic rifle, and during
 4              the commission of crime, the inmate
 5              had a clear opportunity to cease but
 6              instead continued.  The inmate was -
 7              - had a special relationship of
 8              trust with the victim who was his
 9              estranged girlfriend and the mother
10              of his children.  In a manner this
11              crime was committed -- created a
12              potential for serious injury to
13              persons other than the victim of the
14              crime.  Mitigating factor: the
15              inmate participated in the crime
16              under partially excusable
17              circumstances alcohol intoxication,
18              which did not -- which did not
19              amount to a legal defense.
20    Okay.  There's no juvenile history, and there is no
21    adult history as for as crime is concerned.  You'd
22    never been in trouble before Mr. Foreman with the law?
23    Okay.  I'm going to read a little at you.  Feliciano
24    is the second of two -- of six children born to and
25    raced by his natural parents in Cuba.  He has a twin
26    brother who was raced in Cuba until he was 28 or 29.
27    Came to the United States via the boatlift from Cuba
```

1   in the early '80s.  He stated that he disliked the

2   communist state and was given an opportunity to by

3   Fidel Castro, so he chose to accept the boatlift

4   process.  Is that correct, sir?

5           INMATE FELICIANO:  Yes, sir.

6           PRESIDING COMMISSIONER SAWYER:  So you were

7   a boat person, huh?

8           INMATE FELICIANO:  Yes, sir.

9           PRESIDING COMMISSIONER SAWYER:  He went

10  through school to the ninth grade and then stated when

11  he was inducted into the Cuban army in 1970s.  He

12  stated that after some repeated discussion he

13  acknowledged that he was in the Cuban army for

14  approximately six months.  He acted strange enough for

15  them to consider him to be crazy and was sent to see a

16  psychiatrist.  He stated that he was placed in a

17  military jail for approximately three months then

18  released.  The record indicated that he simply did not

19  like the military lifestyle or be told what to do.  He

20  stated that simply one day he refused to put his

21  uniform on and began the process that led to his

22  discharge from the army.  Subsequently he worked in a

23  variety of trades including mechanic.  He was first

24  married in 1970 through '74 or '75.  He has one

25  daughter from this union.  His ex-wife and daughter

26  reside in Cuba.  Are they still in Cuba?

27          INMATE FELICIANO:  Yes.

14

1          **PRESIDING COMMISSIONER SAWYER:**  Do you have

2    any contact with them?

3          **INMATE FELICIANO:**  Yes.

4          **PRESIDING COMMISSIONER SAWYER:**  Second

5    relationship was a non-wed union, which lasted for

6    approximately three years, and there are two sons from

7    this relationship and your ex-common law wife and sons

8    remain in Cuban -- in Cuba.  Is that true?

9          **INMATE FELICIANO:**  Yes.

10         **PRESIDING COMMISSIONER SAWYER:**  And are they

11   still there?

12         **INMATE FELICIANO:**  Yes.

13         **PRESIDING COMMISSIONER SAWYER:**  And do they

14   -- do you correspond or do you write to them?

15         **INMATE FELICIANO:**  Yes.  They write me.

16         **PRESIDING COMMISSIONER SAWYER:**  And they

17   write to you?

18         **INMATE FELICIANO:**  Yes.

19         **PRESIDING COMMISSIONER SAWYER:**  The third

20   relationship was a non-wed union to his common-law

21   wife, who was the victim of the incident offense, and

22   there were two sons born in Cuba and one daughter born

23   in the United States from this union.  He has no idea

24   of what their status is at this time.  Since being

25   incarcerated, he is presently married in a lawful

26   union, which occurred during his incarceration in 1991

27   '91.  So you have a wife now?

1            **INMATE FELICIANO:** Yes.

2            **PRESIDING COMMISSIONER SAWYER:** Okay. Are

3  you still married?

4            **INMATE FELICIANO:** Yes. And you haven't --

5  you're not in touch with your two sons and your

6  daughter that you had with Ms. Hernandez?

7            **INMATE FELICIANO:** No.

8            **PRESIDING COMMISSIONER SAWYER:** Not -- not

9  at all. Although, the record revealed that Feliciano

10 reported drinking six or seven beers prior to the

11 instant offense, he stated he only had two or three

12 beers on that day. His reaction to the instant

13 offense was that it was a mistake. When he came to

14 this country, he was immediately -- shipped

15 immediately to New Orleans and then rerouted to San

16 Bernardino County accordingly -- according to the

17 record, he was sent to a refuge camp in Florida and

18 then came to California with a surviving victim and

19 his wife and children and they were released from the

20 refuge camp. You've worked as an auto mechanic,

21 repair business on an informal basis, and formally you

22 were on public assistance?

23            **INMATE FELICIANO:** Yes.

24            **PRESIDING COMMISSIONER SAWYER:** Welfare

25 sometimes called. You had a brief period where you

26 worked at a Burger King, but that ended in a dispute

27 over a paycheck and taxes and Social Security were

1    withheld.  Did you have any other work?  Did you do

2    any other than a mechanic and a brief time at Burger

3    King?  Did you do any other kind of work?

4         INMATE FELICIANO:  Yes.

5         PRESIDING COMMISSIONER SAWYER:  Before you

6    came to prison?

7         INMATE FELICIANO:  Yes.

8         PRESIDING COMMISSIONER SAWYER:  What kind of

9    work was that

10        INMATE FELICIANO:  I worked in a motor home

11   making motor homes.

12        PRESIDING COMMISSIONER SAWYER:  Motor homes?

13        INMATE FELICIANO:  In Riverside

14        PRESIDING COMMISSIONER SAWYER:  In

15   Riverside?  What was the name of that company?

16        INMATE FELICIANO:  I don't know the name.

17   It's too long.

18        PRESIDING COMMISSIONER SAWYER:  Okay.

19        INMATE FELICIANO:  It's too long.

20        PRESIDING COMMISSIONER SAWYER:  It was a

21   long time ago?

22        INMATE FELICIANO:  Yes.  Okay.  His future

23   plans include that he would live with his wife.  How

24   do you pronounce your wife's first name?

25        INMATE FELICIANO:  Alejandra.

26        PRESIDING COMMISSIONER SAWYER:  Alejandra,

27   A-L-E-J-A-N-D-R-A, Feliciano in Corcoran California.

1          **INMATE FELICIANO:** No, she lives now in

2  Hanford.

3          **PRESIDING COMMISSIONER SAWYER:** She lives in

4  Hanford now?

5          **INMATE FELICIANO:** Yes.  Does she come to

6  visit with you?

7          **INMATE FELICIANO:** Yes.

8          **PRESIDING COMMISSIONER SAWYER:** Employment,

9  although he has no firm job offers at this time, it

10 said that he would work in the upholstery field or as

11 on auto mechanic.  He completed his vocational

12 upholstery class, but has no training in auto

13 mechanics since his -- and that's where it ends since

14 his.  Okay.  Incarceration in 1982, nothing in his

15 file to indicate that he has any mechanic skills or

16 training.  His file does include some training and

17 skills as a glassier, so you know how to put glass in?

18         **INMATE FELICIANO:** Yes.

19         **PRESIDING COMMISSIONER SAWYER:** You know how

20 to do windows?

21         **INMATE FELICIANO:** Yes.

22         **PRESIDING COMMISSIONER SAWYER:** He was in

23 the United states -- this is in the INS status.  He

24 was in the United States for about three years when he

25 committed the instant offense.  He was a boat person

26 from Cuba and he entered the United States via

27 Florida.  An immigration hold was placed on him

```
 1   October 19, 1983, by the San Francisco Office of the
 2   INS.  Okay.  Let's see what kind of support letters
 3   you have here.  This is a letter dated 6/20/of '04.
 4   It's an interpretation of a handwritten letter.
 5            First of all I'm Mrs. Feliciano, the
 6            wife of Pedro Feliciano.  We've been
 7            together 13 years.
 8   She's asking for mercy.
 9            He's had a clean life, clean record.
10            She doesn't worry about her husband
11            work -- not working.  I can take
12            care of that.  She claims here that
13            you are both Christians and Seventh
14            Day Adventists.  She is very
15            supportive and she wants to know
16            when she can pick you up.
17   And that's signed by Alejandra Feliciano.  What kind
18   of work does she do, sir?
19            INMATE FELICIANO:  She's not working right
20   now because she had an accident in the car.
21            PRESIDING COMMISSIONER SAWYER:  Oh.
22            INMATE FELICIANO:  And she can work right
23   now.
24            PRESIDING COMMISSIONER SAWYER:  She can
25   work?
26            INMATE FELICIANO:  No.
27            PRESIDING COMMISSIONER SAWYER:  Was she hurt
```

1    in the accident?

2              **INMATE FELICIANO:**  Yeah.  She hurt her back

3    and she (indiscernible) and they took a little bone in

4    the side --

5              **PRESIDING COMMISSIONER SAWYER:**  Yeah.

6              **INMATE FELICIANO:**  -- from in there.

7              **PRESIDING COMMISSIONER SAWYER:**  Oh --

8              **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

9    Vertebrae.

10             **PRESIDING COMMISSIONER SAWYER:**  Repaired

11   vertebrae?

12             **INMATE FELICIANO:**  Yeah.

13             **PRESIDING COMMISSIONER SAWYER:**  Okay I have

14   another record -- another letter here from the

15   Hanford Bilingual Seventh Day Adventists Church, it

16   says:

17             You're a baptized member and good

18             regular standing at the Seventh Day

19             Adventist Church.  You're a fine man

20             with a good heart.  Believe you have

21             the determination and great desire

22             to be released from prison, has the

23             church family waiting for him upon

24             release and immediately assist him

25             with a job.  This job position would

26             help him earn a living.

27   It doesn't say what kind of job.  What kind offer job

1   does your church have for you?

2           INMATE FELICIANO:  They have a --

3           INMATE FELICIANO THROUGH INTERPRETER ZEBALE:

4   Construction.

5           PRESIDING COMMISSIONER SAWYER:

6   Construction?

7           INMATE FELICIANO:  Yeah (indiscernible)

8           PRESIDING COMMISSIONER SAWYER:  I'm sorry?

9           ATTORNEY SPOWART:  Tell Mr. Zabale.

10          INMATE FELICIANO THROUGH INTERPRETER ZEBALE:

11  They also have a job food service restaurant.

12          PRESIDING COMMISSIONER SAWYER:  Okay.  And

13  that's dated May 11, 2004, Antonio Huerta, H-U-E-R-T-

14  A, Pastor of the Hanford Bilingual Seventh Day

15  Adventist Church.  And I have a hand-written note for

16  Art Bricno, B-R-I-C-N-O, Hanford California, dated May

17  14, of '04 employment for Pedro:

18          I'm willing to help Ms. Feliciano

19          who is a member of my church with

20          employment for her husband Pedro.

21          Self-employed building contractor

22          and can hire him 30 to 36 hours per

23          week at minimum wage.  He will start

24          as a trainee/assistant handy man

25          working plumbing, roofing, drywall,

26          painting, clean ups.  I only require

27          a good attitude to have a job.

1        Respectful.   ..rt Briend.

2    And that's all the . ters.  Commissioner?

3        **DEPUTY COMM: SIONER FILANGERI:**  Thank you,

4    Commissioner Sawyer.  This part of the hearing we're

5    going to talk at your behavior since the last time you

6    appeared before the board, that was in August of 2002,

7    and you received a two-year denial.  The Board

8    recommended that you remain disciplinary free, up

9    grade vocationally and educationally and participate

10   in self-help programs.  The first document I want to

11   refer to is the correctional counselor's report of

12   August 2004, and unfortunately, I don't have a

13   signature sheet on mine.  Do you have one on yours

14   counselor?

15       **ATTORNEY SPOWART:**  Sure don't.

16       **DEPUTY COMMISSIONER FILANGERI:**  The -- and

17   the prost-conviction progress report doesn't have a

18   correctional counselor signature either, so we don't

19   know who author of this is.

20       **PRESIDING COMMISSIONER SAWYER:**  Who is your

21   counselor?

22       **INMATE FELICIANO:**  (Indiscernible)

23       **PRESIDING COMMISSIONER SAWYER:**  Who?  Who

24   wrote this?

25       **INMATE FELICIANO:**  I change counselors all

26   the time.  (Indiscernible)

27       **DEPUTY COMMISSIONER FILANGERI:**  That's okay.

1    It's okay.  The record will just reflect we don't know
2    who the counselor was.  Under post-conviction factors
3    counselor points out that there's been participation
4    in therapy and self-help programs.  The 12-week
5    (indiscernible) Anger Management and the Life Skills
6    Program.  He also attended a nine-week Impact Program,
7    but you were unable to complete it due to your
8    transfer to CTF Central.  Shows Chronos for AA and NA
9    as a contributing member.  Disciplinary history has
10   been clear.  In fact your last disciplinary was in
11   1984 where a cell search revealed a weapon in the
12   toilet.  The weapon was a stick with a -- with a razor
13   blade on it.  The cell was occupied -- occupied by you
14   and another inmate.  There was also a failure to
15   report to school.  So for over 20 years there have
16   been no disciplinaries.  Your last negative Chrono was
17   1995 for non-excused absence.  The next document I
18   want to consider is the psychiatric report.  I should
19   have mentioned that your case was placed on the
20   calendar in 2004, but postponed because the psych
21   report was too old.  This report was written in
22   October of 2004, signed by Joe Reed, R-E-E-D, Ph.D.
23   Staff Psychologist.

24            **PRESIDING COMMISSIONER SAWYER:**  Let's --
25   we're going to go off the record and take a recess
26   just for a second to get our teleconference in order
27   here.  Go off the record.

25

1                    [Off the record]

2             **DEPUTY COMMISSIONER FILANGERI:** Okay. We're

3    back on.  Don't turn it off just -- sir, 1 was

4    referring to the psychiatric report of item 14, the

5    assessment of dangerousness the examiner thought there

6    was the risk for violent behavior within the

7    controlled setting was considered to be low relative

8    to the level two inmate population in the prison

9    setting it says based on two factors including

10   psychological instructs.  The HRC20 suggests a low

11   risk of violence relative to the inmate population in

12   the prison setting as well as within the community and

13   the HARE Psychologist checklist, short version,

14   suggested did not suggest the presence of sociopath.

15   If released for the community the risk for violence is

16   to be that of the average citizen in the community.

17   Clearly the main observations the inmate is competent

18   and responsible for his behavior and he has the

19   capacity to abide by institutional standards.  The

20   inmate does not have a mental health disorder.  In

21   looking through your file, the last vocational

22   certificate I saw for completion was Vocational

23   Upholstery, is that right? ?

24             **INMATE FELICIANO:** Yes, sir.

25             **DEPUTY COMMISSIONER FILANGERI:** That was

26   1995?

27             **INMATE FELICIANO:** Yes, sir.

16

DEPUTY COMMISSIONER FILANGERI: Since then
you've had various jobs. Now you're working as a
barber?

4          INMATE FELICIANO: Yes, sir.

5          DEPUTY COMMISSIONER FILANGERI: That's
6   confirmed by a addendum post-conviction progress
7   report submitted August 2005. It suggest that they
8   were no work performance reports, however, I thought
9   saw one in the file that was twos and threes. Yes,
10  that was submitted February 8, 2005, generally above
11  average and average marks. This is a counselor whose
12  name I cannot make out in the signature. It says
13  there's been no vocational training, no academics.
14  The group activities were not noted, no psych
15  treatment. I saw an indication that you were
16  participating in Adult Basic Education? The last
17  Chrono there was 1993, at that point they thought that
18  you would be able to pass the GED in six months, but I
19  didn't see any GED. Would you care to comment on
20  that?

21          INMATE FELICIANO THROUGH INTERPRETER ZEBALE:
22  I haven't taken my GED. My eyesight problem prevents
23  me from doing that.

24          DEPUTY COMMISSIONER FILANGERI: All right.
25  How about any other vocational training?

26          INMATE FELICIANO THROUGH INTERPRETER ZEBALE:
27  I can't do any vocations here because I'm unable to

1   use state boots. I have to use tennis shoes.

2           DEPUTY COMMISSIONER FILANGERI:   They won't

3   allow you to use tennis shoes?

4           INMATE FELICIANO:  No.

5           INMATE FELICIANO THROUGH INTERPRETER ZEBALL

6   For safety reasons, they won't let you go through each

7   gate.

8           DEPUTY COMMISSIONER FILANGERI:  So your

9   vision prevents you from going to educational

10  training, and your shoes prevent you from going to

11  vocational training?

12          INMATE FELICIANO:  Yes, sir.

13          DEPUTY COMMISSIONER FILANGERI:  All right.

14  Is will anything else you think we should put on the

15  record at this point about your behavior since the

16  last time you were here?  Back to you Commissioner

17  Sawyer.

18          PRESIDING COMMISSIONER SAWYER:  Thank you

19  Counsel, do you have any questions for the inmate.

20          ATTORNEY SPOWART:  No, I have no question.

21          PRESIDING COMMISSIONER SAWYER:  Do you have

22  any additional questions, Commissioner?

23          DEPUTY COMMISSIONER FILANGERI:  No.  No, he

24  doesn't want to talk about the crime offense.  No

25  other questions.

26          PRESIDING COMMISSIONER SAWYER:  Would you

27  like to close?

**ATTORNEY SPOWART:** Yes. Mr. Feliciano,

pardon me. He's 53 years old today. He was 29 years

old at the time of the crime. He had come from Cuba

with his common-law wife, who was the victim, with her

children and on a boatlift. They had lived together

for quite a number of years. At the time of the crime

he didn't talk about it, but it is a part of the crime

and I would like you to look at page -- I can't see

the page -- oh, page 2 of the Probation Officer's

Report where it talks about circumstances leading up

to the life crime and this is in the record, so I'm

going to address it. As far as he was concerned, he

was getting a long fine, he and his wife, and then one

night or one day she doesn't show up and she was going

out to go to the store or something and she didn't

come back and then somebody tells her -- well she's

left. The other individual that was sitting in the

car at the time of the crime supposedly was Mr.

Feliciano's friend. In actuality, he had been having

a relationship with the wife. He told him, Mr.

Feliciano, well eventually he told him that she was

living with him, and now -- when she left initially,

she took the children are him -- her, but then she

brought the children and left them with him, my

client. She just said they're yours take care of

them. Sometime after that, this -- her boyfriend

calls and says -- she had -- in the meantime she had

1  visits the children but then after that the boyfriend
2  calls him and says she wants the children back and Mr.
3  -- my client was concerned about the children, and he
4  says no she can come and visit them, but she can't
5  take the children back, you know, until -- she had
6  given them to him, so this -- this is what sets the
7  scene for that day. And now this is not an excuse,
8  but you understand -- if you look at Title 16
9  Administrative Code that sets up these hearing and it
10  says what you look at to understand the situation if
11  something had developed over a period of time in which
12  this had puts a great amount of stress on an
13  individual which this certainly did, this involved in
14  children, his wife, his so-called friend, you can
15  understand his feelings and emotions. And this goes
16  to the very important fact that when we're looking at
17  an inmate here we want to know does he pose an
18  unreasonable risk of danger to society in general, you
19  know, is he the kind of a guy that walks into a 7-
20  Eleven blows away a clerk and for 10 or $15. No that
21  was never -- my client had been a gentleman all of his
22  life. He has tried to live a good life. This was a
23  period of stress. He acted irrationally. There was
24  no excuse for it. He certainly did not intend to kill
25  his wife, and I'll get to that in a second when I
26  cover the psych report, but I -- I just want you to
27  set the stage of how it came about. Is he given the

1   circumstances highly unlikely to ever recur again and
2   based on his age a chance of recidivism are low.  He
3   had no juvenile record.  Born in Cuba, raised -- was
4   in the Cuban army didn't like it and managed to
5   convince him that he wasn't a good prospect for the
6   Cuban army and got out and the first chance he had to
7   get out of Cuba, he took it.  Took his wife for a
8   better life.  As far as the motivation, it was an
9   argument in stress.  Adult record was an instant
10  offense only, so we're not looking at a man who had a
11  long period of criminal activity, he did not.  We're
12  not looking at a man whose a potential danger to the
13  average person on the street, he is not.  This was a
14  particular set of circumstances highly unlikely to
15  ever recur.  He has expressed remorse to the psych,
16  and I'll address that at the time.  He has good parole
17  plans.  He has a place to live.  He has a job offer.
18  Institutional adjustment is very good.  He has 2115s
19  and those are back in '84 and has commissioner said
20  that was over 20 years ago.  Six -- 128A, the last one
21  in '99, which was a decade ago.  None of them had
22  involved violence.  He has job -- he has an INS hold.
23  Now, he's how I can figure when it comes to Cuba, we
24  had discussed this with other Board members in the
25  past Cubans.  It doesn't seem like -- they do actually
26  send them back to Cuba.  They usually take them to
27  some kind of a holding process and what happens to

1   them after that, I don't know, but he does have job
2   offers and a job a place to live here in the states
3   and that is with his wife. Since his last hearing,
4   he's done everything the Board asked him. He can't
5   get a vocation, he physically can do it. He can't
6   upgrade educationally because of his eyes. He has
7   been in AA, got laudatory Chronos. Essentially, he's
8   done everything the Board has asked him to do,
9   everything he can do and based on the circumstances of
10  the offense, his lack of prior criminal history --
11  now, at this point I want to go over the psych report.
12  The course diagnostic impressions, this is a clinical
13  assessment. Axis I, no contributory clinical disorder
14  and Axis II, no personality disorder in addition to
15  regularly attending Narcotic's Anonymous. Inmate
16  Feliciano completed initial nine weeks of Impact Group
17  in 2002, before moving to another facility. In 19 --
18  in 2002, he completed the Muslim Development and
19  Centers Anger Management Course. In April 1999, he
20  completed the Muslim Islamic Addiction Recovery
21  program, a 12-week seminar series. It should also be
22  noted that in 1995 he updated a TABE reading score of
23  12.9, which shows that when he could, he did study,
24  did try to bring up his educational level. When you
25  get to 12.9 that would actually qualify him easily for
26  a vocational course accept physically, he can't do it.
27  Under view of the life crime --

1           **DEPUTY COMMISSIONER FILANGERI:**  Excuse me.

2                       (Off the record)

3           **DEPUTY COMMISSIONER FILANGERI:**  This is side

4    two of the tape-recorded hearing transcript of Mr.

5    Pedro Feliciano, F-I-L-I-C-I-A-N-O, C-59854.  Sorry

6    for the interruption.  Go ahead Counselor.

7           **ATTORNEY SPOWART:**  Under review of the life

8    crime the last paragraph Inmate Feliciano observed

9    that the death was a tragedy and it was appropriate

10   for him to use his firearm.  He demonstrated empathy

11   think for the damage done to the victims including his

12   ex-wife, her boyfriend, and his three children.  He

13   seems generally penitent for his crime and appears to

14   understand the causative factors leading to the

15   instant offense.  He seems committed to never using

16   violence to solve problems again.  Then what we really

17   want to know is what the psychologist assessment of

18   his dangerousness to society, because that's basically

19   why we're here today.  Well, it is why we're here

20   today.  His risk for violent behavior when in the

21   controlled setting is considered to be low relative to

22   this level to inmate population and a prison setting,

23   and then he says this conclusion is based on several

24   factors which he goes on to list.  During the

25   interview two psychological instruments were also

26   administered results from the ACR20 suggest a low risk

27   of violence relative to the inmate population in both

1   the prison setting and within the community.  I    in
2   of a HARE Sociopathy Checklist short version a    n
3   suggest the presences of a sociopathy. Therefo  e   in
4   light of this - these factors, his risk of violence is
5   considered to be low relative to inmate populat on and
6   this inmate population here is a level two is l w to
7   begin with.  If released to the community clinically
8   assessed his risk for violence is expected to be
9   average to that of average citizen in the community.
10  There are no significant risk factors or precursors to
11  violence for this individual.  And if you look at his
12  life before this -- this terrible crime for which he
13  is paying -- he is paying.  You'll see that nowhere in
14  the past has there been violence.  He wanted to get
15  out of the army.  He didn't -- he just wanted to live
16  a life.  He wanted to come to the states to live a
17  better life.  This -- this was stress built up over a
18  period of time that caused an irrational reaction, and
19  the psych evaluating him now said he's -- does not
20  present a problem.  Clinical observations comment and
21  recommendations he talks about this inmate -- this
22  inmate does have a significant alcohol abuse history
23  as it was related to the instant offense, however  he
24  has adequately completed a number of alcoholic
25  anonymous groups over the years.  It is only suggested
26  that he participate in one year of Alcohol Anonymous
27  group during parole.  And that the single and only

1  thing the psych had to say otherwise he was absolutely

1  a positive, and based on his record -- I can only

1  submit it and based on the record and the psych and

4  ask that a finding of suitability be made today.

5          **PRESIDING COMMISSIONER SAWYER:**  Thank you,

6  Counsel.  Mr. Feliciano, this is your opportunity to

7  tell us why either you think you're suitable for

8  parole.

9          **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

10  I think I'm entitled to another opportunity.  He says

11  this is the first time in my life where I committed a

12  crime and made a mistake.  And I know I'm older now

13  and I'm more experienced, and I'm not -- I'll be

14  living with my wife now.  Or my family and much less

15  the government to give me this opportunity.   I

16  acknowledge that I am guilty for what I did and what I

17  did was very wrong.  I apologize more than anyone for

18  the children for the accident or non-accident where I

19  took their mother's life away and I also ask that for

20  an apology for forgiveness for the authorities of this

21  country for the crime that I committed.  Nowadays, I

22  have God in my heart and I leave it all entirely in

23  God's hand -- hands who knows me more than anyone and

24  that's it.

25          **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

26  you very much.  The time is 9:41 a.m. and we will be

27

1   recessing for deliberation.//

2                          R E C E S S

3                          --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1    re-essing for deliberation.//

2                    R E C E S S

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

36

## CALIFORNIA BOARD OF PAROLE HEARINGS

### D E C I S I O N

**DEPUTY COMMISSIONER FILANGERI:** We're
on record.

**PRESIDING COMMISSIONER SAWYER:** Okay. The
time is 10:09 in the matter of Pedro Feliciano. The
panel's reviewed all information received from the
public and relied on the follow circumstances in
concluding that the prisoner is not suitable for
parole and would pose an unreasonable risk of danger
to society or threat to public safety if released from
prison. The offense was carried out in an herbally
callous manor. On June 15, 1982 Mr. Rodriguez and Ms.
Hernandez, the estranged wife of Pedro Feliciano,
pulled up in front of his apartment. There was a
conversation, Mr. Feliciano went inside of his
apartment came out -- or came into the doorway brought
a rifle a 22. Caliber automatic rifle from his house,
stood in the doorway fired two to four shots in the
direction of the victim striking Rodriguez in the neck
and Mrs. Hernandez -- Ms. Hernandez, his estranged
wife, in the head. Subsequently, Mr. Rodriguez was
injured -- was able to drive away out of harm's way
and Ms. Hernandez was pronounced dead at the
Loma Linda Medical Center. That's particularly
callous and was clearly carried out in a
PEDRO FELICIANO C-59854 DECISION PAGE 1 8/31/05

1    dispassionate calculated manner.    r. Rodriguez
2    -- Mr. Feliciano did not talk to    about the
3    crime, and we had questions certai ly that would
4    have given us a little more insi t into what he
5    was thinking at the time. Althou , there's an
6    indication that he had been drin ng with two
7    different reports that he was dr ling at the4
8    time of the offence. He was -- wo to four
9    shots into the car not knowing wat was behind
10   that car. It was an apartment building,
11   certainly was a definite hazard to other people
12   driving by or walking other houses -- the
13   offense was carried out in a manner, which
14   demonstrates an exceptional callous disregard
15   for the safety of others. The motive in the
16   crime was trivial. There was a disagreement.
17   There was an estrangement here that needed to be
18   worked out in court. It needed to be worked out
19   between you and Mrs -- Mr. Feliciano and Ms.
20   Hernandez if there was going to me a separation
21   or there may have been a separation at that time
22   the three children were the most important part
23   of this and their safety of course was the most
24   important part of this but they -- this needed
25   to be worked out in court in a court of law As
26   opposed to being taken -- Mr. Feliciano taking
27   PEDRO FELICIANO C-59854 DECISION PAGE 2 8/31/05

3:

1    this into his own hands, and he was obviously
2    very upset about the fact that Mr. Rodriguez and
3    Ms. Feliciano -- or Ms. Hernandez came back to
4    see the children.  He has no previous record.
5    For the period of time 22 years that he's been
6    in custody he has -- he is limited in a -- has
7    programmed in a limited manner given the fact
8    that he has eye and feet limitations in terms of
9    being able to read and being able to work.  He
10   claims he can't work because of he has to wear
11   tennis shoes and can't wear boots as is required
12   to be to work in the trades.  Very limited on
13   marketable skills right -- currently he is a
14   barber.  He has performed upholstery up until
15   1995.  He's had 22 years to get his GED and he
16   has not completed that claiming that because of
17   his eye problem he hasn't been able to do that.
18   It's not -- he's -- he has been in some self-
19   help and therapy programs.  He's been
20   discipline-free since 1995 on his 128s and 1984
21   on his 115s.  He only had two 115, six, 128s.  He
22   had -- his psychological October 26, of '04, Dr.
23   Reed says that he's a low risk of violence in
24   custody and an average risk in the community.
25   I'm a little troubled by his parole plans.  He
26   does have a wife that lives in Hanford
27   PEDRO FELICIANO C-59854 DECISION PAGE 3 8/31/05

1   California that she indicates in a letter that
2   she would -- he could move in with her.  That's
3   not troubling.  The troubling part is that he
4   has a job offer but it's in construction, and
5   I'm sure that he's going to have to wear boots
6   if he's going to work in the construction
7   trades, and so that whether that -- whether he's
8   motivated to wear boots in the  -- upon release
9   or whether he's -- he may not be able to do
10  construction trades.  He has marketable skill.
11  Again, he did complete upholstery in 1995, 10
12  years ago, and currently he's doing barbering
13  work, which is a marketable skill.  We'd like to
14  see Mr. Feliciano be a little more motivated in
15  trying to work on his self-help and vocational
16  areas.  Again, I'll make note that there are
17  limitations.  He should be commended for his
18  laudatory recovery AA and NA laudatory Chronos,
19  the Impact Program, Anger Management Program.
20  These are all very positive steps for his
21  future.  However, these aspects do not outweigh
22  the factors of unsuitability and we recommend
23  two years.  Commissioner, do you have anything
24  you'd like to say?
25          DEPUTY COMMISSIONER FILANGERI:  Yes,
26  thank you Commissioner, I do.  I want to
27  PEDRO FELICIANO C-59854 DECISION PAGE 4 8/31/05

46

1   certainly make note of the prisoner's recent
2   participation in self-help, that's good.
3   Vocational educational participation, however,
4   has been nonexistent for about a decade.  Of
5   course this is due to prisoner's limitations.
6   Counsel relied on a passage from the psych
7   report to conclude the prisoner is genuinely
8   remorseful over the Commitment Offence, but his
9   remarked at the DPT in 2000 the last time he
10  chose to comment on the Commitment Offence it
11  sounds like he's more sorry about the impact the
12  crime has had on him rather than feeling
13  genuinely remorseful.  I'd like the quote the
14  parole suitability hearing of August 21, 2000
15  from page 16 beginning on line five:
16          Presiding Commissioner Bardinaro
17          (phonetic) "okay how do you feel
18          about this crime now?" Inmate
19          Feliciano, "this is too bad"
20          (indiscernible) "because, you
21          know, I lose everything.  I lose
22          my life, I lose my kids.  I lose
23          everything, you know.  Because
24          when you lose one kid it's too
25          hard for your heart, you know.
26          You lose three it's very, very
27  PEDRO FELICIANO C-59854 DECISION PAGE 5 8/31/05

1        nard. You lose your family or
2        lose everything. In this
3        moment, you know, I try
4        protecting my kids, you know,
5        because this - this woman you
6        know I know I make these
7        consequence. I no do nothing."
8        Presiding Commissioner Bardinaro
9        "what about your wife? When I
10       asked you how you feel about the
11       crime you didn't even mention
12       your wife? Inmate Feliciano,
13       "my wife." Presiding
14       Commissioner Bardinaro "the one
15       -- Inmate Feliciano, "Lazarra"
16       Presiding Commissioner Bardinaro
17       "yeah the one that you killed?"
18       Inmate Feliciano, "I don't have
19       any trouble she -- she and me is
20       okay, you know, she is, you
21       know, take a decision, leave it.
22       It's okay, you know."
23    Counsel also suggest the Commitment Offence was
24    a result of a particular set of circumstances
25    that are unlikely to be repeated in the future,
26    but there simply are too many unanswered
27    PEDRO FELICIANO C-59854 DECISION PAGE 6 8/31/05

42

      questions about the Commitment Offence for me to

      conclude that the prisoner's release would not

      pose a threat to public safety at this time,

4  thank you.

5            **PRESIDING COMMISSIONER SAWYER:**  Thank

6  you.

7            **ATTORNEY SPOWART:**  Commissioner, before

8  we close at this point and time I want to state

9  for the record that my client did not get a fair

10  hearing.  He has a right not to have to talk

11  about the life crime.  It's all in the record

12  and you stated that in your -- one of the things

13  you stated clearly on the record that you wanted

14  to be able to talk to him at the life crime.

15  Now, you aggregated his right.  He did not have

16  a fair hearing so I object to this hearing.

17            **PRESIDING COMMISSIONER SAWYER:**

18  Counsel, it certainly is your client's right to

19  not talk about the Commitment Offence.  You use

20  the record in providing your conclusions.  We

21  went back to the record.  In looking to answer

22  some questions that we have about the commit

23  offense.  Your clients not being disadvantaged

24  because he didn't talk about the Commitment

25  Offence, I'm saying in my statement I have too

26  many questions about the Commitment Offence to

27  PEDRO FELICIANO C-59854 DECISION PAGE 7 8/31/05

41

1    conclude that the prisoner's release would not

2    pose an unreasonable risk to public safety.  I

3    have the questions.  Whether your client chose

4    to talk about the Commitment Offence or not, I

5    still have the questions --

6         **ATTORNEY SPOWART:**  I'm not talking

7    about your comments, Commissioner.  I'm talking

8    Commissioner Sawyer's comments, who stated right

9    on there, we wanted to talk to him about the

10   life crime.  Well, you can't have it both ways.

11   You can't say well you have a right not to talk

12   about it but then come out and say well you've

13   been denied for two years because we wanted to

14   talk to you about the life crime --

15        **DEPUTY COMMISSIONER FILANGERI:**  I'm

16   sorry -- well go ahead you wanted to make a

17   comment.

18        **ATTORNEY SPOWART:**  No.  I'll leave.

19   I'll leave it.  I'll leave it alone.

20        **PRESIDING COMMISSIONER SAWYER:**  We

21   recommend in this case that no more 115s, 128s.

22   Get self-help, stay disciplinary free learn a

23   trade if possible and earn positive Chronos.

24

25

26

27   PEDRO FELICIANO C-59854 DECISION PAGE 8 8/31/05

1   That concludes this hearing.

2                              --o0o--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON: _____ DEC 2 : 2005

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   PEDRO FELICIANO C-59854 DECISION PAGE 9 8/31/05

## CERTIFICATE AND
### DECLARATION OF TRANSCRIBER

I, FELICIA TOWNSEND, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 44, and which
recording was duly recorded at CORRECTIONAL TRAINING
FACILITY, at SOLEDAD CITY, CALIFORNIA, in the matter
of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF
PEDRO FELICIANO, CDC NO. C-59854, ON AUGUST 31, 2005,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated , OCTOBER 3, 2005, at Sacramento,
California.

FELICIA TOWNSEND
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, FELICIS TOWNSEND, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 44, and which
recording was duly recorded at CORRECTIONAL TRAINING
FACILITY, at SOLEDAD CITY, CALIFORNIA, in the matter
of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF
PEDRO FELICIANO, CDC NO. C-59854, ON AUGUST 31, 2005,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated , OCTOBER 3, 2005, at Sacramento,
California.

FELICIA TOWNSEND
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT B
# (PSYCH EVALUATION)

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1999)
PAROLE CONSIDERATION HEARING
JANUARY 2005 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
OCTOBER 6, 2004

This is an addendum to the psychological evaluation for the Board of Prison Terms on completed on 12/10/99 by Dr. Carswell. This report is for the Board of Prison Terms on inmate Pedro Feliciano, CDC# C-59854. This report is based upon a personal clinical interview of the inmate, conducted on 10/06/04, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

Inmate Feliciano is a 53-year-old Cuban whose date of birth is 04/21/52. Spanish is his primary language, and English is his secondary language. He has good conversational speech and English skills. A certified interpreter was utilized for this interview.

Inmate Feliciano reported that he continues to maintain a good relationship with his wife and their daughter. He said they communicate by phone calls and visits. He said there is no history of abuse with these relationships. Inmate Feliciano said that he has worked successfully as a barber for the last three years within CDC. He also notes that he has been regularly attending Alcoholics Anonymous for many years. Alcohol abuse was related to the instant offense. Inmate Feliciano said that he prefers to live in Hanford with his wife, who has agreed to this arrangement. He notes that he has offers to work in construction. He also has skills in upholstery and working as a barber.

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Feliciano was alert and oriented to person, place and time. He was well dressed and groomed. His speech was reasonably articulate, given that English is his secondary language, and his speech was contextually meaningful. His mood and affect were within normal limits, and his behavior was appropriate to the setting. No evidence of a mood or thought disorder was demonstrated. His estimated level of intellectual functioning was within the average range.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

AXIS I:     No contributory clinical disorder.
AXIS II:    No contributory personality disorder.

In addition to regularly attending Narcotics Anonymous, inmate Feliciano completed the initial nine weeks of impact group in 2002 before moving to

FELICIANO, PEDRO
CDC NUMBER: C-59854
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

another facility. Also in 2001, he completed the Muslim developmental center's anger management course. In April 1999, he completed the Mulati Islami addiction recovery program, a 12-week seminar series. It should also be noted that in 1995, he obtained a TABE reading grade point level of 12.9.

## XIII.  REVIEW OF LIFE CRIME:

Inmate Feliciano described the circumstances surrounding his instant offense, involving first degree murder with a firearm and attempted murder. He admits full responsibility for the death of the victim, his former common-law wife with whom he lived for approximately ten years. She was approximately 22 years of age at the time of her death. They had three children.

Inmate Feliciano described how they had become separated, and that he initially tried to raise his three children by himself, noting that he was on welfare and could not simultaneously work and bring up his young children. He said that his ex-wife was with another man, and that her new boyfriend often threatened him, trying to coerce him to give up the children and give them to his ex-wife. He said at one point, his ex-wife and her boyfriend came to his residence, and that his ex-wife's boyfriend then pressured him to give up the children.

Mr. Feliciano said he thought her boyfriend had a firearm. Mr. Feliciano described how he subsequently got his .22 caliber rifle, and thought that his ex-wife's boyfriend was reaching for a firearm when he subsequently shot his rifle twice, with one bullet passing through his ex-wife's boyfriend's neck, and then subsequently striking his ex-wife in the head, killing her. He did acknowledge that he had been drinking (approximately five to six beers at the time) and was intoxicated. He said that he felt threatened for his life by previous threats made by his ex-wife's boyfriend. He acknowledged that he was also afraid that they were going to take his children away.

Inmate Feliciano observed that the death was a tragedy, and that it was inappropriate for him to use his firearm. He demonstrated empathy for the damage done to the victims, including his ex-wife, her boyfriend, and his three children. He seems genuinely penitent for his crime and appears to understand the causative factors leading to the instant offense. He seems committed to never using violence to solve problems again.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  His risk for violent behavior within a controlled setting is considered to be low relative to this level II inmate population in a prison setting. This conclusion is based upon several factors.

On the one hand, he was drinking and was intoxicated at the time of the instant offense. He has obtained two CDC-115 disciplinaries, both in 1984, one for failure to report to school, and the other for having a

FELICIANO, PEDRO
CDC NUMBER: C-59854
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

weapon. He has received six CDC-128 minor disciplinaries, the last received in 1995.

On the other hand, however, he has no juvenile criminal history, and he was a refugee from Cuba, having come to the United States around 1970. He has no history of gang affiliation. He has no significant adult criminal history other than that of the instant offense. Moreover, he is a first-termer. He has had only two CDC disciplinaries, and they both appear to be of the minor administrative variety. Indeed, he has not received a significant disciplinary in 20 years. During this time, importantly, he has never received a significant disciplinary either for substance abuse or violent behavior. He appears to have matured greatly within the structured environment within CDC and profited from his attendance and participation in numerous self-help groups.

During the interview, two psychological instruments were also administered. Results from the HCR-20 suggest a low risk of violence relative to the inmate population in both the prison setting and within the community. Results from the Hare Psychopathy Checklist, Short Version, do not suggest the presence of sociopathy.

Therefore, in light of these factors, his risk for violence is considered to be low relative to the inmate population.

B.    If released to the community, clinically assessed, his risk for violence is expected to be average to that of the average citizen in the community.

C.    There are no significant risk factors or precursors to violence for this individual.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

1.    This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and he has done so during his incarceration.

2.    This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole.

3.    This inmate does have a significant alcohol abuse history, as it was related to the instant offense. However, he has adequately completed a number of Alcoholics Anonymous groups over the years. It is only suggested that he participate in one year of Alcoholics Anonymous group during parole.

FELICIANO, PEDRO
CDC NUMBER: C-59854
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


Joe Reed, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

JR/gmj

D: 10/06/04
T: 10/08/04


*D:\Word Files\BPT - 2004\FELICIANO, PEDRO  C-59854  01-05   REED.doc*

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
AUGUST 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 3, 2002

Inmate Pedro Feliciano, CDC# C-59854, was seen for a mental
health evaluation for the Board of Prison Terms by M.
Carswell, Ph.D., Staff Psychologist at CTF, on 12/10/99 for
the February 2000 Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

**BILL ZIKA, Ph.D.**
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

BZ/gmj

D:   05/03/02
T:   05/03/02

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
FEBRUARY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 10, 1999

This is the fifth psychological evaluation for the Board of
Prison Terms on inmate Pedro Feliciano.  This report is the
product of a personal interview, conducted on 12/10/99, as
well as a review of his Central file and unit health record.
This single contact interview was for the express purpose of
preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Feliciano is a 48-year-old, married, Hispanic
      male.  His stated religious affiliation is Christian.
      No unusual physical characteristics were noted and he
      denied the use of any nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      Inmate Feliciano was the second of six children.  He
      stated there were no prenatal or perinatal concerns or
      birth defects.  He had no abnormalities of
      developmental milestones.  All speech, language and
      motor development occurred unremarkably.  He denied any
      history of cruelty to animals or any history of arson.
      He stated he had no significant childhood medical
      history and denied any childhood history of physical or
      sexual abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Inmate Feliciano attended public school and completed
      the ninth grade.  He has not to this date pursued his
      GED.  He states he has an eye problem that prevents him
      from reading more than five minutes at a time, so he
      has not yet furthered his education.  His Central file
      reflects that in 1998, he scored 7.7 on his TABE test.

IV.   FAMILY HISTORY:

      Inmate Feliciano's mother is 67.  His father died in
      1994.  All of his family live in Cuba and write letters
      to keep in touch.  He states that he has a wife and a

FELICIANO, PEDRO
CDC NUMBER: C-59854
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

family friend who do visit occasionally. He states that his family is close.

V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Feliciano states that he is a heterosexual male. He denied any history of high-risk sexual behavior either prior to or since incarceration.

VI.  MARITAL HISTORY:

Inmate Feliciano was married from 1970 to 1975 and has one daughter from that relationship. His ex-wife and daughter are in Cuba. He had a three year, common-law relationship and had two sons from that relationship; they also live in Cuba. His third relationship was the victim of his commitment offense. He has three children from that relationship. Lastly, the inmate was married in 1991 and remains married to this wife.

VII. MILITARY HISTORY:

Inmate Feliciano states that he was in the Cuban army in 1970 for six months and then was put in jail because he had been acting strangely in the army. He was then released and was out of the army.

VIII. EMPLOYMENT AND INCOME HISTORY:

Prior to his incarceration, inmate Feliciano was employed at Burger King for six months, as a trailer manufacturer for six months, and then he started to work as a mechanic and was self-employed. Since incarceration, he has completed vocational upholstery. He was then doing auto mechanics and body and fender work, but could not finish that vocation due to the fact that he could not wear boots.

IX.  SUBSTANCE ABUSE HISTORY:

Inmate Feliciano denies a history of substance abuse. However, he was under the influence of alcohol at the time of the commitment offense, having stated that he drank three or four beers. He states that he went to Alcoholics Anonymous in 1993.

FELICIANO, PEDRO
CDC NUMBER: C-59854
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

B. CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    No Contributory Clinical Disorder.
AXIS II:   Antisocial Personality Disorder, improved.
AXIS III:  No Contributory Physical Disorder.
AXIS IV:   Incarceration.
AXIS V:    GAF = 70.

Should this inmate at this time be given a parole or
release date, his prognosis is positive for his ability
to maintain his present gains in the community.

XIII. REVIEW OF LIFE CRIME:

Inmate Feliciano described the circumstances
surrounding his commitment offense. He states that he
made a big mistake and was young. He was also
inexperienced and did not know to call the police when
things happened. He felt at the time that he needed to
take care of things himself. Now, with some maturity
and experience, he knows what to do in cases such as
marital discord and domestic problems.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.  Due to this inmate' lack of any CDC-115 violations
since 1983, it is felt that he would pose a less
than average risk for violence when compared to
this Level II inmate population.

B.  If released to the community, his violence
potential is estimated to be no higher than the
average citizen in the community.

C.  The most significant risk factor as a precursor to
violence for this inmate would be a return to the
use of alcohol or drugs.

XV. CLINICIAN OBSERVATIONS, COMMENTS AND RECOMMENDATIONS:

A.  This inmate is responsible for his behavior. He
has the ability to abide by institutional standards
and has overwhelmingly done so during his
incarceration period because of his disciplinary-
free record since 1983.

FELICIANO, PEDRO
CDC NUMBER:  C-59854
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

B. This inmate has no mental health disorder which would necessitate treatment either during his incarceration period or after parole.

C. This inmate could benefit from attendance at Alcoholics Anonymous as a part of parole.

M. Carswell Php

M. CARSWELL, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad


STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MC/gmj

D:  12/10/99
T:  12/23/99

# EXHIBIT C
# (LIFE PRISONER EVALUATION)

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2004 CALENDAR

FELICIANO

C-59854

## I.    COMMITMENT FACTORS:

A.    Life Crime: Feliciano was received into the Department of Corrections on 1/27/83, following conviction for Murder in the First Degree with Use of a Rifle. He received a total sentence of 27 years to life. He also has a non-controlling case of Attempted Murder, which is included in the instant offense in San Bernardino County under Case Number SB SCR39275; Victim Rodriguez, age unknown. The victim was his ex-common-law wife, Lizarra Hernandez, age 22. Feliciano has a current M.E.P.D. of 9/6/98. This information was obtained from the Legal Status Sheet and the Probation Officer's Report.

1.    Summary of Crime: On June 15 1982, at approximately 8:18 p.m. officers from the Colton Police Department responded to 555 East Congress Street in Colton to "shots fired". Subsequent investigation revealed that Feliciano's (subject) estranged common-law wife Lizarra Hernandez, (victim) went to his residence in order to see her three children. She was driven to the house by her boyfriend of two months, Pedro Rodriguez (witness). While still in the vehicle, they were approached by Feliciano who advised Rodriguez to "take out the rifle," because he was going to obtain one. Ms. Hernandez then informed Feliciano that Mr. Rodriguez did not have a rifle. Feliciano obtained a .22 caliber automatic rifle from his house, stood in the area of the doorway, and fired two to four shots in the direction of the vehicle, striking Rodriguez in the neck and Ms. Hernandez in the head. Rodriguez was able to drive the vehicle away from the area and made contact with the police. Both victims received emergency medical care and shortly thereafter Ms. Hernandez was pronounced dead at Loma Linda Medical Center. Feliciano was arrested at his residence at approximately 8:33 p.m. This information was taken directly from the Probation Officer's Report.

2.    Prisoner's Version: After interviewing Feliciano for this report, he stated that his version remains the same as written in his January 1998 report. The report reads as follows: Feliciano stated that he never told Rodriguez to "take out the rifle". He stated that when Rodriguez pulled up in his car, he parked right in front of Feliciano's apartment. He told Feliciano that

INMATE COPY
CTF-SOLEDAD          AUGUST 2004

Ms. Hernandez wanted her children back. Feliciano told him he could not give up the children and told Rodriguez to move his car from the front of his apartment. He claimed he had told Rodriguez to move his car from the front of his apartment. He claimed he had told Rodriguez that Ms. Hernandez could go into the apartment to see her children. Then he said that Rodriguez refused to move his car, so Feliciano went into his apartment and got a .22 caliber rifle. He says that as he stood in his doorway, he saw Rodriguez reach down. He thought Rodriguez was reaching for a weapon, so he claims he fired two rounds, not knowing his ex-common-law wife was still in the car. He claims that even when he was arrested, he did not believe at first he had killed Ms. Hernandez. He said he felt badly and was concerned, because he knew he was going to jail and there would be nobody to take care of his children. He said he didn't have any problems with his ex common-law wife, and never intended to kill her.

### 2.    Aggravating/Mitigating Circumstances:

   a.    **Aggravating Factors:**
   - The victims were particularly vulnerable, they were inside the vehicle when Feliciano opened fire with a .22 caliber automatic rifle.

   - During the commission of the crime, the inmate had a clear opportunity to cease but instead continued.

   - The inmate had a special relationship of trust with the victim, who was his estranged girlfriend and the mother of his children.

   - The manner in which the crime was committed created a potential for serious injury to persons other that the victim of the crime.

   b.    **Mitigating Factors:**
   - The inmate participated in the crime under partially excusable circumstances (alcohol intoxication) which do not amount to a legal defense.

### B.    Multiple Crime(s):

   1.    Summary of Crime: None.

   2.    Prisoner's Version: None.

II.    PRECONVICTION FACTORS:

A.    Juvenile Record:  No Juvenile record.

B.    Adult Convictions:  The instant offense is Feliciano's only conviction.

C.    Personal Factors:  After interviewing Feliciano for this report, he stated that the
information on the 1/1988 report appears valid and has no further information to
add. The report reads as follows:  Feliciano is the second of six children born to,
and raised by, natural parents in Cuba. He has a twin brother. He was raised in
Cuba until he was age 28 or 29 and came to the United States via the Marial
boatlift from Cuba in the early 80's. He stated that he disliked the Communist
State and when given the opportunity by Fidel Castro, he chose to accept this boat
lift process.

He went through school to the ninth grade and then stated that he was inducted
into the Cuban Army in 1970. He stated that after some repeated discussion, he
acknowledged that he was in the Cuban Army for approximately six months,
acted strange enough for them to consider him to be "crazy" and he was sent to
see a psychiatrist. He stated then that he was placed in a military jail for
approximately three months and then released. The record indicated that he
simply did not like the military lifestyle nor being told what to do; he stated that,
simply, one day he refused to put his uniform on and it began the process that led
to his discharge from the army. Subsequently, he worked in a variety of trades,
including "mechanic."

He was first married in 1970 through 1974/1975 and there is one daughter from
this union; ex-wife and daughter reside in Cuba. The second relationship was a
non-wed union which lasted for approximately three years and there are two sons
from this relationship; ex-common-law and the sons remain in Cuba. His third
relationship was also a non-wed union and this common-law "wife" was the
victim of the instant offense; there were two sons born in Cuba and one daughter
born in the United States from this union. He has no idea what their status is at
this time. Since being incarcerated, he is presently married in a lawful union
which occurred during his incarceration in 1990/1991.

Although the record revealed that Feliciano reported drinking six or seven beers
prior to the instant offense, he stated that he only had two to three beers on that
day. His reaction to the instant offense was that it was a "mistake".

Feliciano stated that when he came to this country he was shipped immediately to
New Orleans and then rerouted to San Bernardino County. According to the
record, he was initially sent to a "refugee camp" in Florida and then came to

California with the surviving victim and his wife and children when they were
released from the refugee camp. Since arriving in the United States, he worked on
his own in the auto mechanic/repair business on an informal basis; formerly, he
was on public assistance. He stated that he had a fifteen-day period of
employment with Burger King, which ended in a dispute over his paycheck, in
taxes and social security withheld.

Since being incarcerated, Feliciano has worked in several assignments. Two
CDC-115's were noted and included: Weapon Found in Cell (7/17/84) and
Failure to Report to School (7/20/84). Minor CDC-128's noted. It was also noted
that Feliciano was the victim of a stabbing assault on 6/5/88. When asked to
describe the circumstances of this, he simply states that he was the type of
individual who could do many things and also had nice things. The assailant may
have been upset that Feliciano was able to follow orders and complete tasks in a
well above average manner which may have led to the stabbing.

Feliciano is a 45 year old Cuban National refugee who is a first termer. In the
Probation Officer's Report, Feliciano reported that he was discharged from the
Cuban Army, and also was committed to a psychiatric hospital for nine months in
Cuba as a result of "nerves". He explained he did not know what diagnosis was
made in his case but said that he continued to receive outpatient treatment from
1978 until he left Cuba. In the instant offense, Feliciano admitted guilt, but
claimed extenuating circumstances. He claimed the male victim had previously
threatened him, he thought he was in possession of a rifle, and he did not know
that his common-law wife was seated in the vehicle next to the male victim when
he opened fire to "scare him". In the Probation Officer's Report of 12/17/82,
Feliciano indicated that he had consumed six or seven beers but was not "real
intoxicated". His Institutional Staff Summary dated 2/22/83 reflects that he stated
that he had been "intoxicated on beer at the time of the commission of the
offense". The same report indicates that background information revealed that
Feliciano had threatened both the male victim and his common-law wife
previously and that a duel had been arranged between the male victim and subject
a month earlier, but the victim did not arrive at the appointed time. The report
speculates that the incident apparently stemmed from the fact that Feliciano's
common-law wife deserted him and entered into a relationship with the male
victim, a fellow Cuban who Feliciano stated he knew for over three years, initially
meeting him in a refugee camp in Florida.

It appears that over the years Feliciano has changed his mind on issues regarding
the instant offense as well as facts regarding his alcohol and psychiatric problems.
In his psychiatric report of 7/10/86, Feliciano told the psychiatrist that he shot the
victim in self-defense. In preparation for his Board Report on 7/24/86, Feliciano
told his counselor that victim Rodriguez made several threatening telephone calls
to Feliciano saying that he would kill him if he did not relinquish his control of

SUBSEQUENT PAROLE C...
AUGUST 2004 CALENDAR

the three children and return ... ...s. Hernandez. Feliciano stated that
Rodriguez had made one of ... ... atening phone calls on the day of the instant
offense. He stated that Rodr... ... threatened to kill him if he did not give up the
children. In this report, Felic... ...dicated he was intoxicated. In preparation for
his 1989 Board appearance, ... ...ano told his counselor that the rifle "went off by
itself", without any intention, on ... part of harming the victims. Although he
maintained that he shot her accidentally, he accepted indirect responsibility for his
wife's death, in that had she not had an affair, she would not have left him, and
the entire situation would have been avoided. His denial at that time was so great
that he expressed the belief that his wife had actually been shot by someone else
after the other wounded victim drove her away.

## III.    POSTCONVICTION FACTORS:

### A.    Special Programming/Accommodations:
None.

### B.    Custody History :

| PLACEMENT DATE | LOCATION | HISTORY | EFF DATE |
|---|---|---|---|
| 1/27/83 | CIM-RCC | | |
| 3/1/83 | FOL | CLO B | 3/9/83 |
| 1/20/84 | CIM | | |
| 2/22/84 | FOL | | |
| 4/22/85 | CIM | | |
| 5/17/85 | FOL | MED A | 12/11/86 |
| | F. L. | CLO B | 6/14/88 |
| 6/6/88 | CSP | MED A | 6/22/88 |
| | | CLO B | 2/15/89 |
| | | MED A | 4/19/89 |
| 3/16/90 | CSP/COR | | |
| 4/5/93 | CCI-2 | | |
| 4/27/94 | CMC-W | | |

SUBJECT PAROLE CONSIDERATION HEARING
2004 CALENDAR

5/243/95                                    CTF

C.    Therapy and Self-Help Activities:
Feliciano attended a Millati Islami 12 week (Path to Peace) anger management
program per CDC 128-B dated 4/29/99, 7/22/99 and 2/20/02. On 8/25/99 he
attended a life skills program. On 2/25/02 he attended a 9 week Impact program
but was unable to complete the program due to transferring to CTF Central
Facility. Feliciano received a laudatory AA/NA chrono for being a contributing
member and showing positive participation per CDC 128-B dated 2/22/04.

D.    Disciplinary History:
      115's
      1. 7/17/84    Folsom      3000A/3006A      Weapon in cell. Guilty.
                                                 Assessed 60 days loss of
                                                 Credits.
      2. 7/20/84    Folsom      3041             Failure to report to school.
                                                 Warned and reprimanded.

      128's
      1. 7/24/84    Folsom                       Unexcused absence.

      2. 2/8/92     Corcoran                     Covering window on cell.

      3. 3/16/92    Corcoran                     Not in assigned seat.

      4. 9/7/93     Tehachapi                    Unexcused absence.

      5. 12/2/94    CMC                          Gambling.

      6. 11/3/95    CTF                          Unexcused absence.

E.    Other:
      None.

IV.   FUTURE PLANS:

A.    Residence: Feliciano stated he would live with his wife Alejandra Feliciano at
      920 ½ Avenue, Apartment 109, Corcoran, CA 93212, telephone number (209)
      992-3167. This would not be the county of commitment.
                        488   9 ½   Ave   Hanford   Ca, 93230   (559) 585-0408
B.    Employment: Although he has no firm job offers at this time, Feliciano stated
      he would seek work in the upholstery field or as an auto mechanic. He completed
      the vocational upholstery class, but has no training in auto mechanics since his

B.    Employment:  Although he has no firm job offer at this time, Feliciano stated he would seek work in the upholstery field or as an auto mechanic.  He completed the vocational upholstery class, but has no training in auto mechanics since his incarceration in 1982.  There is nothing in his file to indicate he has any mechanic skills or training.  His file does indicate he has some training and skills as a glazier.

C.    Assessment:
      None.

V.    USINS STATUS:  His USINS number is A22808182.  He stated he entered the United States sometime in 1979.  He was in the U.S. about 3 years when he committed the instant offense.  He was a "boat person" from Cuba.  He entered the U.S. via Florida.  An immigration hold was placed on him October 19, 1983, by the San Francisco office of the USINS.

VI.   SUMMARY:

A.    Based on the commitment offense, prior prison record, and prison adjustment, Feliciano would probably pose a low risk to the public if released from prison.  Feliciano has remained disciplinary free since 1984.  He has been an active participant in self help and therapy programs throughout the year of 1999 and 2002.  Feliciano received a recent NA/AA laudatory chrono dated 2/22/2004 for showing his ability to comprehend all aspects of the Twelve Step Program.  Feliciano also has learned a trade in upholstery while in prison and would like to pursue this trade as possible employment.  This writer believes that Feliciano has shown positive programming adjustment while in prison and deserves consideration for parole.

B.    Prior to release, the prisoner could benefit from: upgrading vocationally and educationally and participate in self help and therapy programs.

C.    This report is based upon an interview with the prisoner on 4/23/04 lasting approximately ½ hour and a complete review of the Central File lasting 1 ½ hour (s).

D.    Prisoner was afforded an opportunity to review his central file, per the Olsen decision, on 4/23/04 which he declined per CDC 128-B.

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCON        PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 01/05 to 01/04 | | | PLACEMENT: Remained at CTF among the general population. |
| | | | CUSTODY: Medium A. |
| | | | VOCATIONAL TRAINING: None noted during this period of review. |
| | | | ACADEMICS: None noted during this period. |
| | | | WORK RECORD: He is currently assigned to Z-Wing as a barber. There are no CDC 101's in his central file during this period. |
| | | | GROUP ACTIVITIES: He received a Laudatory Chrono dated 2/22/04 for actively attending and participating in the Alcoholic's Anonymous/Narcotics Anonymous Program. |
| | | | PSYCH. TREATMENT: None noted during this review period. |
| | | | PRISON BEHAVIOR: None noted during this review period. |
| | | | OTHER: None. |

ORDER:

☐ BPT date advanced by ____ months.    ☐ BPT date affirmed without change.
☐ PBR date advanced by ____ months.    ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

FELICIANO              C-59854              CTF              AUGUST 2004

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA

BOARD OF PRISON TERMS

CONTINUATION SHEET - LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 01/04 to present (4/23/04) | | | PLACEMENT: Remained at CTF among the general population.<br>CUSTODY: Medium A.<br>VOCATIONAL TRAINING: None noted during this period.<br>ACADEMICS: None during this period.<br>WORK RECORD: He is currently assigned to a Wing as a Barber. There are no CDC 101's reflecting his job performance noted.<br>GROUP ACTIVITIES: None noted during this period.<br>PSYCH. TREATMENT: None noted during this period.<br>PRISON BEHAVIOR: None noted during this period.<br>OTHER: None. |

ORDER:

☐ BPT date advanced by _____ months.
☐ PBR date advanced by _____ months.

☐ BPT date affirmed without change.
☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

FELICIANO                C-59854                CTF                AUGUST 2004

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV. 1/86)

_J. Palmer_
Correctional Counselor I
_Date_ 7-20-04

_L.R. Baker_ _R. m. PADILLA, CCII_ _Date_ 7-21-04
Correctional Counselor II

_J. Clancy_
Facility Captain
_Date_

_D. S. Levorse_
Classification and Parole Representative
_Date_ 7-28-04

# EXHIBIT D
# (PREVIOUS DECISIONS)

INITIAL PAROLE CONSIDERATE HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number C-59854
)
PEDRO FELICIANO )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 3, 1998

9:30 A.M.

PANEL PRESENT:

ARTHUR VAN COURT, Presiding Commissioner
M. GUADERRAMA, Commissioner
PAT CASSADY, Deputy Commissioner

OTHERS PRESENT:

PAT FOX, Attorney For Inmate
PEDRO FELICIANO, Inmate
JOSE ZAVALE, Spanish Interpreter

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
___✓___ Yes          See Errata Sheet

LeAna Bilotta, Transcriber      Capitol Electronic Reporting

38

## CALIFORNIA BOARD OF PRISON TERMS

### D E C I S I O N

PRESIDING COMMISSIONER VAN COURT: Okay,
Mr. Feliciano, the Panel reviewed all the information
received from the public and relied on the following
circumstances in concluding that the prisoner is not
suitable for parole and would pose an unreasonable
risk of danger to society and a threat to public
safety if released from prison. The offense was
carried out in an especially cruel and callous manner.
The offense was carried out in a dispassionate and
calculated manner. These conclusions are drawn from
the Statement of Facts wherein the prisoner shot and
killed his ex-wife and shot her boyfriend by striking
him in the neck when the two pulled in front of his
house. He claims that he fired two shots, one
striking the boyfriend in the neck, and the other
striking his estranged wife in the head. The prisoner
has an unstable social history. He was born in Cuba,
he went into the Cuban military, but ended up in the
military jail because he was acting strange and did a
period of time in the Cuban military prison and then
was released. He came to this country in the
(inaudible) boat lift. He's failed to demonstrate
evidence of positive changes. Misconduct while
incarcerated, he's had two 115s since he's been in

PEDRO FELICIANO   C-59854   DECISION PAGE 1   02/03/98

39

prison, the last one was on 7/20/84. So the prisoner
should be commended for being disciplinary-free since
1984. The prisoner needs additional therapy in order
to face and gain insight into why he committed this
crime. The psychological reports are not totally
supportive. The most recent one classifies him as
adult anti-social behavior, but improved. He should
be encouraged to add to his vocational training when
ever possible and also pick up more speed with your
English. You are doing well, but the better that you
get at it, the more practice you have, the better you
will get. You also had a report from '89, from
Dr. Clavere, Stephen Clavere, and he diagnosed him,
let's see, he stated that he has Axis I, adult anti-
social behavior with a paranoid personality traits,
presently very mild, improving with institutional
structure and maturity. So, you should take advantage
of any and all therapy that becomes available. Like
Dr. Bakeman has a one-on-one where you can discuss
your actual lack of insight on why you killed this gal
accidently, if that was indeed accidently. And also
why you shot the other man. You are denied parole for
a period of two years. The hearing Panel finds that
it is not reasonable to expect that you would be
granted a hearing during the following two years --
Granted a parole during a hearing in the following two
PEDRO FELICIANO    C-59854    DECISION PAGE 2    02/03/98

40

1   years.  The specifi reasons for this finding are as
2   follows:  The prisoner committed the offense in an
3   especially cruel and callous manner, he shot and
4   killed his estranged wife and shot and wounded her
5   boyfriend.  As a result a longer period of observation
6   and evaluation is required before this Board can set a
7   parole date.  We feel like you should take advantage
8   of any and all therapy that becomes available.  And
9   then continue with any vocational training.  You've
10  gotten certificates now in, is it dry cleaning?

11         INMATE FELICIANO:  Upholstery.

12         PRESIDING COMMISSIONER VAN COURT:  Upholstery,
13  it's upholstery, right.  Okay, then the Panel
14  recommends that you remain disciplinary free, upgrade
15  vocationally and educationally, and participate in
16  self-help and therapy programming.  That concludes the
17  hearing.  Here's a copy of this decision.  And you're
18  doing well and keep it up.  Do you have anything that
19  you would like to add, Commissioner Guaderrama?

20         COMMISSIONER GUADERRAMA:  Yeah, you are really
21  doing very well, but you ought to get some more, talk
22  to some of the clinicians or the psychologists and
23  find out what's going on.  Because you are admitting
24  to having, taking responsibility for killing you wife,
25  but you're not telling us the real reason.  I don't
26  believe it.  And if you were jealous or mad, or
27  PEDRO FELICIANO   C-59854   DECISION PAGE 3   02/03/98

41

1    whatever it was, this is what it ought to be. Don't
2    make up stories that the man was going for a gun, if
3    in fact he didn't a gun, or in fact, that's not true.
4    If you couldn't see your wife in the car I don't see
5    how you could see somebody grab a gun.
6           INMATE FELICIANO: [Through interpreter] I
7    wasn't jealous or anything. I was --
8           COMMISSIONER GUADERRAMA: You need to explain
9    that to me the next time you come in. You think about
10   that, okay.
11          INMATE FELICIANO: Yes.
12          COMMISSIONER GUADERRAMA: All right. That's
13   all.
14          DEPUTY COMMISSIONER CASSADY: Good luck to you,
15   sir.
16          PRESIDING COMMISSIONER VAN COURT: Okay, that
17   ends the hearing. Good luck to you.
18                        --o0o--
19
20
21
22
23
24
25   PAROLE DENIED THREE YEARS
26   EFFECTIVE DATE OF THIS DECISION        AP
27   PEDRO FELICIANO   C-59854   DECISION PAGE 4   02/03/98

42

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, LeAna Bilotta, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total ONE in number and cover a total of pages number 1 - 41, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA in the matter of the INITIAL PAROLE CONSIDERATION HEARING OF PEDRO FELICIANO, CDC NUMBER C-59854, on FEBRUARY 3, 1998, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 28, 1998, at Cameron Park, California.

LE ANA BILOTTA
TRANSCRIBER
CAPITOL ELECTRONIC REPORTING

54

1           CALIFORNIA BOARD OF PRISON TERM

2                 D E C I S I O N

3         PRESIDING COMMISSIONER BORDENKAR:  We're

4 back on the record.  Everyone who was

5 previously in the room has returned in the case

6 of Feliciano.  The time is approximately 4:00

7 o'clock.  The Panel has reviewed all the

8 information received from the public and relied

9 on the following circumstances in unanimously

10 concluding that the prisoner is not yet

11 suitable for parole and would pose an

12 unreasonable risk of danger or threat to

13 society, a threat to public safety if released

14 from prison.  The commitment offense was

15 carried out in an especially cruel manner.

16 Multiple victims were attacked, one was

17 injured, one was killed in the same incident.

18 The offense was carried out in a manner which

19 demonstrates an exceptionally callous disregard

20 for human sufferings.  These conclusions are

21 drawn from the Statement of Facts wherein the

22 inmate took a rifle from his house and fired

23 shots at his estranged common law wife,

24 Ms. Hernandez, who was 22 years old at the

25 time.  She was hit in the head and was killed

26 rather instantly, and also he hit Pedro

27 **PEDRO FELICIANO   C-59854  DECISION PAGE 1  8/21/00**

1    Rodriguez in the neck, who ... the boyfriend of
2    his victim.  Apparently there had been
3    arguments over custody of the children, which
4    were at the time residing with the inmate, and
5    these events culminated into, culminated with
6    the shooting, which took the life of the mother
7    of his children.  His previous record, there is
8    no apparent juvenile or adult record for the
9    inmate.  Institutionally, he has failed to
10   upgrade educationally as previously recommended
11   by the Board.  I know this Hearing Panel notes
12   that there is a chrono describing an eye
13   problem, on one hand, on the other hand, it
14   seems that Mr. Feliciano is able to complete
15   self-help and study courses, Bible courses, in
16   the mail and I'm not sure that he should not be
17   able to upgrade educationally somehow.  He's
18   not yet sufficiently participated in beneficial
19   self-help and therapy.  In his parole plans, he
20   does lack realistic parole plans in that he
21   doesn't have viable residential plans in the
22   last county of legal residence, which was San
23   Bernardino County.  And he does not have
24   acceptable employment plans.  The Panel makes
25   the following findings, that the prisoner needs
26   therapy in order to fully understand the
27   **PEDRO FELICIANO   C-59854  DECISION PAGE 2  8/21/00**

56

1    those   e factors which led to his life crime.

2    and    l progress is made, the prisoner

3    continues to be unpredictable and a threat to

4    others.  Nevertheless, the prisoner should be

5    commended for completing his vocation in

6    Upholstery, for his exceptional, above average

7    to exceptional work reports, for his

8    participating in Life Skills, Path to Peace and

9    other self-help programs.  But you also have a

10   certificate in vocational Plumbing, did I see

11   that?

12          ATTORNEY FOX:  Do you have one for

13   Plumbing?

14          DEPUTY COMMISSIONER SMITH:  I didn't see

15   that.

16          PRESIDING COMMISSIONER BORDONARO:  Was

17   there something in Plumbing?  Did you have any

18   Plumbing at all, or was that --

19          INMATE FELICIANO:  Hmm umm.

20          PRESIDING COMMISSIONER BORDONARO:  No?

21   Okay, I wasn't sure.

22          DEPUTY COMMISSIONER SMITH:  I only saw

23   Upholstery.

24          PRESIDING COMMISSIONER BORDONARO:  Okay,

25   it was just the Upholstery vocation?  All right.

26   However, these positive aspects of his behavior

27   PEDRO FELICIANO   C-59854  DECISION PAGE 3  8/21/00

17

1    do not yet outweigh his factors of
2    unsuitability.  In a separate decision the
3    Hearing Panel finds that it is not reasonable
4    to expect that parole would be granted at a
5    hearing during the following two years.  The
6    specific reasons for this finding are as
7    follows:  Firstly, the commitment offense, it
8    was carried out in an especially cruel manner.
9    Specifically, he shot and killed his common law
10   wife and, at the same incident, he hit in the
11   neck his estranged common law wife's boyfriend,
12   Pedro Rodriguez.  This occurred after he shot
13   at the two of them while they were in their car
14   outside of his apartment with a .22 that he had
15   in his living room.  This was a result of an
16   ongoing dispute over the custody of the
17   children with his, with his wife.  Multiple
18   victims were attacked, one was injured, one was
19   killed, in this incident.  And this incident
20   demonstrates an exceptionally callous disregard
21   for human suffering.  And the motive for the
22   crime was trivial in relation to the offense.
23   Secondly, the prisoner has not completed the
24   necessary programming which is essential to his
25   adjustment and needs additional time to gain
26   such programming.  He has failed to fully
27   **PEDRO FELICIANO   C-59854  DECISION PAGE 4  8/21/00**

58

participate in self-help and therapy programming.
And he, we believe, needs to still complete and
upgrade his educational requirements.  Because of
these reasons, a longer period of observation
and evaluation of the prisoner is required
before this Board should find the prisoner is
suitable for parole.  For the next two years,
Mr. Feliciano, we want you to remain
disciplinary-free, to upgrade vocationally and
educationally, as it's available to you, and
also to participate in any self-help and
therapy programming with whatever you can
participate in.  We know that there's some
difficulties that are laid out before you
because of your eye problem and because of your
foot problem.  You know, on the one hand, you
can't wear the boots so that you're not able to
get into vocational training, and yet at the
same hand, you're able to play soccer.  So, you
know, we have some question as to how much
you're really trying to program, at least as
far as what the Board has recommended you to
do.  Especially on the educational level.  Once
again, you know, if there's something, there
ought to be a way with your eyesight to be able
to upgrade yourself educationally.  You're able

PEDRO FELICIANO  C-59854  DECISION PAGE 5  8/21/00

1    to do it with your stuff       us. You told us

2    that you're able to co:... : nible course

3    studies in your cell, a: pefully there's a

4    way that you can pursue t .t: those activities,

5    to upgrade educationall;. Any comments,

6    Mr. Smith?

7         **DEPUTY COMMISSIONER SMITH:**  No comments.

8         **PRESIDING COMMISSIONER BORDONARO:**  Any

9    comments, Ms. Lawin?

10        **COMMISSIONER LAWIN:**  Did you understand

11   what he said?

12        **INMATE FELICIANO:**  Yes, I can do

13   something?  I no play soccer.

14        **PRESIDING COMMISSIONER BORDONARO:**

15   Mr. Smith had said something about soccer.

16        **ATTORNEY FOX:**  Horseshoes.

17        **DEPUTY COMMISSIONER SMITH:**  There's also

18   a certificate, I believe, for soccer.

19        **INMATE FELICIANO:**  Yeah, yeah, but I no

20   play, you know, I (inaudible), I no play.

21        **PRESIDING COMMISSIONER BORDONARO:**

22   Regardless of that, and, :ay, we'll accept

23   that, regardless of that, it's hard to believe,

24   and it may be true, there are no vocations that

25   you can complete without .earing the boots.  I

26   don't know if that's true or not but there's

27   **PEDRO FELICIANO   C-59854  DECISION PAGE 6  8/21/00**

60

1    just things that we think you can still do that
2    you need to do to upgrade yourself,
3    educationally and vocationally, that you're
4    still able to do.  With that, do you have
5    anything else you'd like to say?

6        INMATE FELICIANO:  I want to do it but I
7    no can do it.  I got medical problems, you
8    know.  It not because I don't want to do it, you
9    know.

10       PRESIDING COMMISSIONER BORDONARO:  I
11   understand, I understand, maybe, I mean, keep
12   trying.  There's got to be a way that somebody
13   can help you out to get through that.  Talk to
14   your Counselor, persistence.  Have you ever
15   heard the expression, the squeaky wheel gets
16   the grease?  Keep asking to get into a
17   vocation, keep trying to get in there, and I
18   think that you may find one that doesn't
19   require you to wear the boots.  I mean, I
20   understand the ones in the woodworking shop and
21   the Mill and Cabinet and things like that, but,
22   you know, maybe there's even maybe another
23   facility.  Data Processing, I can't imagine
24   that they'd require you to wear boots in Data
25   Processing.  And I'm not sure that that's
26   allowed here, but there are other facilities
27   PEDRO FELICIANO  C-59854  DECISION PAGE 7  8/21/00

1    that you might effect a transfer to and that
2    might be an option, too.  Talk to your
3    counselor about going to another institution
4    that might have vocations that are more office
5    work related, instead of those related to
6    machinery and things that require the safety
7    boots.  And Data Processing is one that comes
8    to my mind, and I'm not sure if that's offered
9    here but it might be offered at another
10   facility where you can apply for a transfer.
11   And that might help you out with your, with
12   your medical situation.

13        **INMATE FELICIANO:**  Yes.

14        **PRESIDING COMMISSIONER BORDONARO:**  Okay?

15        **INMATE FELICIANO:**  Okay, yes.

16        **PRESIDING COMMISSIONER BORDONARO:**  Okay,
17   I'm going to adjourn the hearing.  The time is
18   4:10.

19        **ATTORNEY FOX:**  Thank you.

20        **INMATE FELICIANO:**  Thank you very much.

21                    --o0o--

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION_____

27   PEDRO FELICIANO   C-59854   DECISION PAGE 8   8/21/00

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA    PREVINI, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 61, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of PEDRO FELICIANO, CDC No. C-59854, on August 11, 2000, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 1, 2000 at Sacramento County, California.

Patricia A. Previni
Transcriber
**CAPITOL ELECTRONIC REPORTING**

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

3    DEPUTY COMMISSIONER GARNER-EASTER:  Yes.

4    PRESIDING COMMISSIONER MOORE:  Thank you.

5    Let the record show that all interested parties

6    have returned to the room.  Pedro Feliciano, CDC

7    Number C59854.  The Panel has reviewed all

8    information received from the public and relied on

9    the following circumstances in concluding that the

10   prisoner is not suitable for parole and would pose

11   an unreasonable risk of danger to society or a

12   threat to public safety if released from prison.

13   One would be the committing offense.  It was

14   carried out in an especially cruel and callous

15   manner.  There were multiple victims attacked or

16   killed in the same incident.  The offense was

17   carried out in a manner which demonstrates an

18   exceptionally callous disregard for human

19   suffering.  These conclusions were drawn from the

20   Statement of Facts wherein the prisoner took a

21   rifle from his house and fired shots at his

22   estranged common law wife.  Her name was Lizarra,

23   that's L-I-Z-A-R-R-A, Hernandez.  She was 22 years

24   of age at the time.  She was shot in the head and

25   was killed rather instantly.  And also, he -- Pedro

26   Rodriguez (inaudible) who was the boyfriend of the

PEDRO FELICIANO  C-59854  DECISION PAGE 1   8/19/02

1   victim.  Apparently there had been an a    ent over
2   custody of the children, which were at    time
3   residing with the prisoner.  And these      to
4   culminated to the shooting which took the life of
5   the mother of their children.  Previous record, the
6   prisoner has no record of juvenile or adult arrests
7   (inaudible).  Institutional behavior, the prisoner
8   has programmed in a limited manner while
9   incarcerated.  He has failed to upgrade
10   educationally and vocationally as previous
11   recommended by the Board.  He has not sufficiently
12   participated in beneficial self-help and therapy
13   programming also recommended by the Board.  At this
14   time, parole plans, the prisoner lacks realistic
15   parole plans in that he does not have a viable
16   residential plan in the last county of legal
17   residence, nor does he have acceptable employment
18   plans in the last county of legal residence.  And,
19   as well, it is known that the prisoner has an INS
20   hold, as well, it's known that the Board has the
21   ability to make other -- or accept other parole
22   plans.  However, he still has to prepare the plans
23   for the last county of legal residence.  Law, 3042
24   notices, the Hearing Panel notes those 3042 notices
25   indicate opposition for a finding of suitability,
26   specifically, the District Attorney's Office of San
27   PEDRO FELICIANO  C-59854  DECISION PAGE 2  8/19/02

1    Bernardino County sent a letter, and it was signed
2    by, actually, the Supervising Deputy District
3    Attorney that (inaudible). That would be signed on
4    August 6, 2002, in opposition to a finding of
5    suitability at this time. Other information
6    bearing on suitability would be that the prisoner's
7    counselor, G. Peabody, writes in the August 2002
8    Board report that the prisoner poses a moderate
9    degree of threat if released to the public at this
10   time. Recommendations or remarks to the prisoner,
11   the Panel makes the following findings. That the
12   prisoner needs therapy in order to face, discuss,
13   understand and cope with stress in a non-
14   destructive manner so the prisoner can better
15   understand his culpability and causative factors of
16   why the prisoner is here today. And until progress
17   is made, the prisoner continues to be unpredictable
18   and a threat to others. Nevertheless, the prisoner
19   should be commended for participating in the
20   learning of the doctrines of Jesus Christ. He
21   participated in a nine week -- the Impact Program.
22   He's participated in a two week anger management
23   program with the Muslim Development Center. He has
24   received positive work reports. He is a barber
25   now. In the past he has received a marketable
26   skill as an upholsterer. However, these positive
27   PEDRO FELICIANO  C-59854  DECISION PAGE 3  8/19/02

23

1   aspects of .. behavior do not outweigh the factors

2   of unsuitabilit, at this time.  Mr. Feliciano, this

3   is another ti year denial.  And in a separate

4   decision the Hearing Panel finds that prisoner has

5   been convicted of murder, and it is not reasonable

6   to expect that parole would be granted at a hearing

7   during the next two years.  And the specific

8   reasons for our findings were as follows.  As

9   mentioned earlier, that the -- you took a rifle

10  from your house, fired the shots at your estranged

11  wife.  She was 22 years old, and you shot and

12  killed her.  Shot her in the head.  She died almost

13  instantly.  And then, also, you shot at the second

14  victim, Pedro Hernandez [sic].  By the grace of

15  God, he didn't die.  However, he was the boyfriend

16  of the wife, of the estranged wife, common law

17  wife.  And then this apparently was over an

18  argument over custody of his children.  There were

19  multiple victims attacked, injured or killed in the

20  same incident.  The offense was carried out in a

21  dispassionate manner, which demonstrates an

22  exceptionally callous disregard for human

23  suffering.  The prisoner has not completed the

24  necessary programming, which is essential to his

25  adjustment, and he needs additional time to gain

26  such programming.  He's failed to participate in

27  PEDRO FELICIANO  C-59854  DECISION PAGE 4   8/19/02

34

1    upgrading himself educationally as was previously
2    recommended to him by the Board, as well as
3    upgrading and receiving a marketable -- an
4    additional marketable skill.  Therefore, a longer
5    period of observation or evaluation of the prisoner
6    is required before the Board should find that the
7    prisoner is suitable for parole.  Recommendations
8    to the prisoner are to remain disciplinary free, if
9    it's available, for the prisoner to upgrade
10   vocationally and educationally, if it's available
11   to the prisoner, to participate in beneficial self-
12   help and therapy programming as recommended.  This
13   concludes our hearing, Mr. Feliciano.
14   Commissioner, any comments to the prisoner?
15         DEPUTY COMMISSIONER GARNER-EASTER:  I have
16   none, thank you.
17         PRESIDING COMMISSIONER MOORE:  Good luck to
18   you, sir.  This concludes our hearing, and the time
19   is 18:00 hours.
20                        --o0o--
21
22
23
24
25   PAROLE DENIED TWO YEARS
26   EFFECTIVE DATE OF THIS DECISION_____ SEP 0 5 2002
27   PEDRO FELICIANO  C-59854  DECISION PAGE 5   8/19/02

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, DEBRA M. SEVEY, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of perjury
that I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1
through 34, and which recording was duly recorded
at CORRECTIONAL TRAINING FACILITY, at SOLEDAD,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of PEDRO FELICIANO, CDC No.
C-59854, on AUGUST 19, 2002, and that the foregoing
pages constitute a true, complete, and accurate
transcription of the aforementioned tape(s) to the
best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated August 31, 2002 at Sacramento County,
California.

Debra M. Sevey
Transcriber
CAPITOL ELECTRONIC REPORTING

**NAME and NUMBER**          **FELICIANO C59854 ZW-244L**          CDC-128-B (Rev. 4/74)
                                                                   CTF-440 (Rev. 2/89)

On February 20, 2002, Inmate FELICIANO, C59854, ZW-244L, was trained on the CDC haircutting safety & sanitation procedures. He was shown a 20 minute video on the proper procedures to maintain and sanitize the haircutting equipment and Barbershop. Above named inmate successfully completed a quiz on the subject and acknowledged his responsibilities for the haircutting equipment in his assigned barber box.

Orig: Central File
    cc: Housing Officer
        I/M Assignment Office
        Culinary File
        Inmate

V. C. Russell, SGT
Barbershop Coordinator
CTF-Central Facility

**DATE: 02/20/2002**          INFORMATIVE (HAIRCUTTERS TRAINING)          **GENERAL CHRONO**

State of California

# Vocational Education
# Completion of Program

*for*

VOCATIONAL UPHOLSTERY

*It is with great pleasure that we sign and present this completion certificate to you.*
*Congratulations for achieving this commendable goal.*

*Issued to*

Pedro  Feliciano

May 23, 1995
*Date*

Tony Kujawa

Mr. Tony Kujawa
*Vocational Instructor*

Mr. Bill Simon
*Supervisor Vocational Instruction*

009 - 95
*Log Number*

SCHOOL
ALL DAY

PEDRO

USC
25-TO
LIFE

TIME CREDIT WAIVER
(2934PC)

I FELICIANO _____ having been committed for an offense which
occured prior to January 1, 1983, understand that conduct credit is granted
to me pursuant to Section 2931 of the Penal Code. I am aware that pursuant
to Section 2931 of the Penal Code my term shall be reduced by one-third for
good behavior and participation.

I hereby waive my rights to the provisions of Section 2931 of the Penal Code.
By making the voluntary waiver, I request that future Time Credit be granted
pursuant to Section 2933 of the Penal Code.

I am aware and understand that Time Credit will be granted, based upon the
work group to which I am assigned as follows:

Work Group A:    For each six months full-time assignment, six months credit,
                 or one day credit for each day assigned for a lesser period.

Work Group B:    For each six months of one-half day assignment or enrollment
                 in a two or four year college program leading to a degree,
                 three months credit, or one day credit for each two days
                 assigned for a lesser period.

Work Group B2:   For each six months on a waiting list, three months credit
                 or one day for each two days on a waiting list for lesser
                 period.

Work Group C:    Zero credit will be earned if I refuse a full time assign-
                 ment.

Work Group D:    When I am in lockup status due to a disciplinary infraction
                 zero credit will be earned for a period equal to the number
                 of days of any credit loss, which may be extended in six
                 month increments thereafter.

I am also aware that my work group may be changed, by the Department, due to my
behavior and/or work performance. This waiver will be effective only when
accepted by the Department. I am also aware that this waiver is irrevocable.

This waiver is accepted by
the Department and is
effective _____

Witnessed:

Title  C/I

Date  9/29/83

Signed: _____

Number: C-59864

Date: 9/29/83

OCT 3 1983

RECORDS OFFICE
FOLSOM STATE PRISON

COPY

CDC619   11/82

RECALCULATION MEPD FOR LIFE AND 25-TO-LIFE PRISONERS
RECEIVED PRIOR TO 5-27-87
PURSUANT TO IN RE MONIGOLD (1988) 205 CAL. APP. 3d 1224
NO DSL TERM OR DSL TERM COMPLETED

w/D: 9-29-83

**A.** CREDITS VESTED PER PC2934 (If offense date prior to 1-1-83)
1. Total days served prior to waiver date (Waiver date
   - received date + postsentenced credit)                = 264
2. A1 ÷ 2 (round down)                                     - 132
3. Less credits lost per PC2932                            - 0
4. Credits to be vested                                    - 132
=================================================================
**B.** MAXIMUM ELIGIBLE PAROLE DATE
1. 1-27-83 _____ + 27 years _____                       = 1-27-2010
   RECEIVED DATE      TOTAL/TERM                           BASE DATE
2. Less total preconfinement credit                       - 319
3. Less A4 OR vest 1/2 postsentence credit                - 132
4. MAXIMUM ELIGIBLE PAROLE DATE                           = 11-2-2008

**C.** WORKTIME CREDIT PER PC2933/PC2934
1. Less NET worktime credit earned from waiver/           - 1964
   received date through 2-15-89 or end of DSL
   term if later
2. Current MEPD (cannot exceed B4)                        = 6-18-2003

**D.** GOOD TIME CREDIT PER PC2931
1. Date credit applied through (2-15-89     - 2-15-89
   or date DSL term ends if later)
2. Days left to serve                       = 5236        = 1746
3. Divide by 3 (round up)                   = 436
4. PC Balance (D3 ÷ 4)                       = 436
5. BC Balance (D4 x 3)                       = 1310
=================================================================
**E.** RECALCULATED MEPD (C2 - D3)                                  = 9-6-98
1. Add credits lost for CDC 115's after D1      + PC ___ - BC ___
2. Subtract restorations for credit losses in E1 - PC___ - BC ___
3. New PC/BC Balance                    PC= ___  BC= ___
4. Add any 7 or 9 year MEPD CS Life term(s)                 + N/A

**F.** ADJUSTED MEPD (E + E1 - E2 + E4)                             = 9-6-98
=================================================================
**G.** INITIAL PAROLE CONSIDERATION HEARING                         = 8/97
   (13 months prior to F)                                    MONTH/YEAR

**H.** NEXT DOCUMENTATION HEARING  # 3                              = 10/92
                                                             MONTH/YEAR
=================================================================
Your Minimum Eligible Parole Date has been recalculated pursuant to
In Re Monigold and you have been granted 1964 days worktime credit
from 9-29-83 through 2-15-89/the end of your DSL term (circle one).
Your recalculated/adjusted (circle one) MEPD is 9-6-98. Your initial
life parole consideration hearing will be scheduled during the month
of 8-97/first available calendar (circle one).

C Johnson soc.                2-1-90
CASE RECORDS STAFF            DATE

C-59854          Feliciano          CSP-720
NUMBER           NAME               INSTITUTION

5/89

COPIED AT STATE EXPENSE
COPIED AT STATE EXPENSE