# EXHIBIT  B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:                )        CDC Number C-59854
                           )
PEDRO FELICIANO            )
                           )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 31, 2005

8:47 a.m.


PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
DOUG FILANGERI, Deputy Commissioner



OTHERS PRESENT:

PEDRO FELICIANO, Inmate
DAVID SPOWART, Attorney for Inmate
JOSE ZEBALE, Interpreter for Mr. Feliciano
Correctional Officers Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum



**Felicia Townsend, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 3 |
| Case Factors | 10 |
| Pre-Commitment Factors | 14 |
| Post-Commitment Factors | 23 |
| Parole Plans | 18 |
| Closing Statements | 28 |
| Recess | 35 |
| Decision | 36 |
| Adjournment | 44 |
| Transcriber Certification | 45 |

--oOo--

1

| 1 | **P R O C E E D I N G S** |
|---|---|

2     **DEPUTY COMMISSIONER FILANGERI:** We're on

3     record.

4         **PRESIDING COMMISSIONER SAWYER:** We're going?

5         **DEPUTY COMMISSIONER FILANGERI:** Yes.

6         **PRESIDING COMMISSIONER SAWYER:** Okay. Thank

7     you. This is the subsequent parole consideration

8     hearing for Pedro Feliciano, F-E-L-I-C-I-A-N-O, CDC

9     number C, as in Charles, 59854. Today's date is

10    August 31, 2005. The time is 8:47 a.m. We're at CTF

11    Soledad. The inmate was received on 1/27 of 1983

12    committed from San Bernardino County. Life term began

13    on 1/27 of 1983, and the inmate's minimum eligible

14    parole date was 6/16/2000. Controlling offense for

15    which the inmate has been committed for is set for in

16    case number SCR, Sam, Charles, Robert, 39275.

17    Charging count one of 187 of the penal code first --

18    murder in the first degree with a weapon, rifle, and

19    the second count of 187, 664 attempted murder, also

20    with a rifle. Mr. Feliciano received a term of 27

21    years to life. This hearing is being tape recorded,

22    and for the purpose of voice identification, each of

23    us is required to state our first and last name,

24    spelling our last name. When it comes to inmate, he

25    needs to state his first and last name, spell his last

26    name and give us his CDC number. I'll start and go to

27    my left. Tom Sawyer, S-A-W-Y-E-R, Commissioner.

2

1          **DEPUTY COMMISSIONER FILANGERI:**  Deputy

2    Commissioner Doug Filangeri, F-I-L-A-N-G-E-R-I.

3          **ATTORNEY SPOWART:**  David Spowart, S-P-O-W-A-

4    R-T, Attorney for Mr. Feliciano.

5          **INMATE FELICIANO:**  Feliciano Pedro, F-E-L-I-

6    C-I-A-N-O, C-59854.

7          **INTERPRETER ZEBALE:**  Jose Zabale, Z-A-B-A-L-

8    E, Spanish interpreter for Mr. Feliciano.

9          **PRESIDING COMMISSIONER SAWYER:**  Thank you.

10   We also have two correctional peace officers in the

11   room for security purposes.  Could I get -- could you

12   turn the air conditioner down one notch?

13         **UNKNOWN SPEAKER:**  Yeah.

14         **PRESIDING COMMISSIONER SAWYER:**  Thank you.

15   Thank you very much.  The record reflects that Mr.

16   Feliciano signed a DPT Form 1073, which is an

17   reasonable accommodation notice in accordance with the

18   provisions of the American's With Disability Act.

19   This was signed -- what is the date on that Mr.

20   Feliciano that you sign it?

21         **INMATE FELICIANO:**  4/20.

22         **PRESIDING COMMISSIONER SAWYER:**  4/20, of

23   what year?

24         **INMATE FELICIANO:**  '04.

25         **PRESIDING COMMISSIONER SAWYER:**  '04.  Okay.

26   It indicates on the form that you do not have any

27   disabilities defined under ADA, is that true?

3

1          **INMATE FELICIANO:**  Yes.

2          **PRESIDING COMMISSIONER SAWYER:**  I want to

3    make a note for the record that Mr. Feliciano is

4    wearing glasses.  Do you need those to read, sir?

5          **INMATE FELICIANO:**  Yes.

6          **PRESIDING COMMISSIONER SAWYER:**  Okay.  Do

7    you have any trouble hearing?

8          **INMATE FELICIANO:**  No.

9          **PRESIDING COMMISSIONER SAWYER:**  No trouble

10    hearing.  Any -- you have no disabilities according to

11    your form; is that correct?

12          **INMATE FELICIANO:**  Yes, sir.

13          **PRESIDING COMMISSIONER SAWYER:**  Okay.

14          **DEPUTY COMMISSIONER FILANGERI:**  Speak up,

15    sir?

16          **INMATE FELICIANO:**  Yes.

17          **PRESIDING COMMISSIONER SAWYER:**  Thank you.

18    The only indication on that form is that you indicated

19    that -- or the counselor whoever filled that out

20    indicated that you need an interpreter for this -- for

21    this hearing?

22          **INMATE FELICIANO:**  Yes.

23          **PRESIDING COMMISSIONER SAWYER:**  Okay.  How -

24    - how is your English, sir?  Do you speak?

25          **INMATE FELICIANO:**  No.  Not too much

26    English.

27          **PRESIDING COMMISSIONER SAWYER:**  Not too

4

1    much.   Okay.   All right.   So you can understand some

2    English, but you do have an interpreter?

3                INMATE FELICIANO:   Yes.

4                PRESIDING COMMISSIONER SAWYER:   Okay, very

5    good.   Can I get the form back, please?   Thank you

6    very much.

7                DEPUTY COMMISSIONER FILANGERI:   Mr. Sawyer?

8                PRESIDING COMMISSIONER SAWYER:   Yes.

9                DEPUTY COMMISSIONER FILANGERI:   I saw

10   something in an old Chrono about -- a comment about a

11   defective eye --

12               INMATE FELICIANO:   Yes.

13               DEPUTY COMMISSIONER FILANGERI:   -- that was

14   causing you pain?

15               INMATE FELICIANO:   Yes.

16               DEPUTY COMMISSIONER FILANGERI:   Can you

17   elaborate on that, please?

18               INMATE FELICIANO:   Yes.   I got this Chrono.

19   I took to the doctor eyes about one month ago, and he

20   said he not keep a Chrono about how his license to

21   keep a Chrono of it in this place and he know what my

22   problem because my problem is the blood is coming

23   inside my eyes.

24               DEPUTY COMMISSIONER FILANGERI:   Can you see

25   through both eyes?

26               INMATE FELICIANO:   Not too good.   When I

27   take my glasses off, I see a little bit.

5

1           **DEPUTY COMMISSIONER FILANGERI:**  But you have

2   vision in both eyes?

3           **INMATE FELICIANO:**  Yeah.

4           **DEPUTY COMMISSIONER FILANGERI:**  Do you have

5   pain in your eyes?

6           **INMATE FELICIANO:**  Yeah, sometimes pain

7   (indiscernible)

8           **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

9   I have like a burning sensation in my eye.

10          **DEPUTY COMMISSIONER FILANGERI:**  Are you

11  having that today?

12          **INMATE FELICIANO:**  No, no.

13          **DEPUTY COMMISSIONER FILANGERI:**  Thank you

14  Commissioner.

15          **PRESIDING COMMISSIONER SAWYER:**  Okay.  Thank

16  you very much.  Counsel, I'm satisfied he understands

17  the form.

18          **ATTORNEY SPOWART:**  Okay.

19          **PRESIDING COMMISSIONER SAWYER:**  We'll waive

20  reading.

21          **ATTORNEY SPOWART:**  Okay.  Thank you.

22          **PRESIDING COMMISSIONER SAWYER:**  This hearing

23  is being conducted pursuant to Penal Code Sections

24  3041 and 3042 and the Rules and Regulations of the

25  Board of Prison Terms governing parole consideration

26  hearings for life inmates.  The purpose of today's

27  hearing is to consider your suitability for parole.

1    In doing so, we will consider the number and nature of

2    the crimes that you are committed for, your prior

3    criminal and social history and your behavior and

4    programs since your commitment.  We've had an

5    opportunity to review your Central File and your prior

6    hearing transcript.  You'll be given an opportunity to

7    correct or clarify the record.  We will consider your

8    progress since your commitment and since your last

9    hearing.  Your updated counselor's report and your

10   psychological report will also be considered.  Any

11   change in your parole plans should be brought to our

12   attention.  Do you understand?

13            **INMATE FELICIANO:**  Yes.

14            **PRESIDING COMMISSIONER SAWYER:**  We will

15   reach a decision today in inform you whether or not we

16   find you suitable for parole and the reasons for our

17   decision.  If you are found suitable for parole the

18   length of your confinement will be explained to you.

19   This hearing will be conducted in two phases.  I will

20   discuss with you the crime that you are committed for,

21   your pyre criminal and social history, your parole

22   plans and any letters of support of opposition that ma

23   be in your file.  Deputy Commissioner Filangeri will

24   discuss with you your progress since your commitment,

25   your Counselor's report, and your psychological

26   evaluation.  Once that is concluded, commissioners,

27   district attorney, if one shows up, and your attorney

7

1    will be given an opportunity to ask you questions.

2    The questions from the district attorney should be

3    asked through the chair and the answers will be

4    directed back to the panel.  Before we recess for

5    deliberation, your attorney and you will be given an

6    opportunity to make a final statement regarding your

7    parole suitability.  Your statements should be

8    directed to as why you feel you are suitable for

9    parole.  When -- we will then recess, clear the room,

10   and deliberate.  Once we've completed our

11   deliberation, we will resume the hearing and announce

12   our decision.  The California Code of Regulations

13   states that regardless of time served a life inmate

14   shall be found unsuitable for or denied parole if in

15   the judgment of the panel the inmate would pose an

16   unreasonable risk of danger to society if released

17   from prison.  You have certain rights.  Those rights

18   include a right to a timely notice of this hearing,

19   the right to he view your Central File, and the right

20   to present relevant documents.  Counsel, have these

21   rights been met?

22           **ATTORNEY SPOWART:**  Yes, they have.

23           **PRESIDING COMMISSIONER SAWYER:**  You also

24   have the right to be heard by an impartial panel.  Any

25   objection to this panel?

26           **ATTORNEY SPOWART:**  I have none.

27           **PRESIDING COMMISSIONER SAWYER:**  You will

8

1    receive a copy of our written tentative did sis today.

2    That decision is subject to review by the Decision

3    Review Unit and by the entire Board meeting as a body.

4    It will become effective within 120 days.  It -- it is

5    about subject to review by the Governor.  A copy of

6    the tentative decision and a copy of the transcript

7    will be sent to you.  As of May 1, 2004, there were

8    minor -- major changes limiting your former right to

9    appeal Board decisions or actions directly to the

10   Board.  The old Board regulations were repealed.

11   Current policy is entitled administrative appeals

12   correspondents and grievances concerning the Board of

13   Prison Terms decisions and is available at the prison

14   law library.  You are not required to omit -- admit

15   you're offense or discuss your offense if you do not

16   wish to, however, this panel does accept true to

17   findings of the court and you are invited to discuss

18   the facts and the circumstances of the offense if you

19   desire.  The Board will review and consider any prior

20   statements you've made regarding the offense in

21   determining your suitability for parole.  Deputy

22   Commissioner, is there any confidential material that

23   will be used in today's hearing?

24           **DEPUTY COMMISSIONER FILANGERI:**  No, there's

25   none.

26           **PRESIDING COMMISSIONER SAWYER:**  Okay.

27           **ATTORNEY SPOWART:**  Excuse me, Commissioner,

9

1    I would like to ask my client?

2              PRESIDING COMMISSIONER SAWYER:  Certainly.

3    We have an understanding?

4              INMATE FELICIANO:  Yes.

5              PRESIDING COMMISSIONER SAWYER:  Do you

6    understand what -- what I'm talking about?

7              INMATE FELICIANO:  Yes, sir.

8              PRESIDING COMMISSIONER SAWYER:  Okay and any

9    time if you -- if you have a question of me or the

10   Deputy Commissioner, please feel free to ask it

11   directly or through your interpreter or through your

12   attorney, okay.  I have a hearing checklist.  I'm

13   going to pass it to the defendant's attorney.  If

14   you'd check that against your documents.

15             ATTORNEY SPOWART:  Yes, I have these.

16             PRESIDING COMMISSIONER SAWYER:  Are there

17   any additional documents to be submitted?

18             ATTORNEY SPOWART:  No.  Right at this time,

19   no.

20             PRESIDING COMMISSIONER SAWYER:  Okay.  Are

21   there any preliminary objections, Counsel?

22             ATTORNEY SPOWART:  I have none.

23             PRESIDING COMMISSIONER SAWYER:  Will the

24   inmate be speaking to the panel?

25             ATTORNEY SPOWART:  Everything -- he doesn't

26   wants to talk about the life crime.

27             PRESIDING COMMISSIONER SAWYER:  He doesn't.

1    Okay.

2              **PRESIDING COMMISSIONER SAWYER:**  Okay.  But

3    he will talk to us regarding other issues.

4              **ATTORNEY SPOWART:**  Yeah.

5              **PRESIDING COMMISSIONER SAWYER:**  Okay.  Mr.

6    Feliciano, would you raise your right hand.  Okay.  Do

7    you solemnly swear or affirm that the testimony you're

8    about to give in this hearing will be the truth, the

9    whole truth, and nothing but the truth?

10             **INMATE FELICIANO:**  Yes.

11             **PRESIDING COMMISSIONER SAWYER:**  Thank you.

12   As you know, Mr. Feliciano, this is being tape

13   recorded, so if we could move that a little to you.

14   You're a soft-spoken guy.  I don't want you to have to

15   tell, but we want to make sure that everything gets

16   onto the record, okay.  Thank you.  Okay.  I'm going

17   to inquire into the facts of the crime.  I'm using the

18   August '04, calendar of the Board Report page one,

19   Summary of the Crime.

20              On June 15, 182 at approximately

21              8:18 p.m. officers from the Colton

22              Police Department responded to East

23              Congress Street in Colton to call

24              shots fired.  Subsequent

25              investigation revealed that

26              Feliciano -- Feliciano's estranged

27              common-law wife Lazarra  -- is that

1          correct?

2          **INMATE FELICIANO:**  Lazarra.

3          **PRESIDING COMMISSIONER SAWYER:**

4          L-A-Z-A-R-R-A, Hernandez, H-E-R-N-A-

5          N-E-D -- H-E-R-N-A-N-D-E-Z, victim,

6          went to his residents in order to

7          see her three children.  She was

8          driven to the house by her boyfriend

9          of two months, Pedro Rodriguez, R-O-

10         D-R-I-G-U-E -Z.  While still in the

11         vehicle, they were approached by

12         Feliciano, who advise Rodriguez to

13         quote, " take out the rifle" end

14         quote, because he was going to

15         obtain one.  Mr. Hernandez then

16         informed Feliciano that Mr.

17         Rodriguez did not have a rifle.

18         Feliciano obtained a 22 caliber

19         automatic rifle from his home --

20         from his house, stood in the

21         driveway -- stood in the area of the

22         doorway and fired two to four shots

23         in the direction of the vehicle

24         striking Rodriguez in the neck and

25         Ms. Hernandez in the head.

26         Rodriguez was able to drive the

27         vehicle away from the area and made

12

1          contact with police.   Both victims

2          received emergency medical care and

3          shortly there after Ms. Hernandez

4          was pronounced dead at Loma Linda

5          Medical Center.   Feliciano was

6          arrested at his residents at

7          approximately 8:33 p.m.

8      This was information that was that was taken directly

9      from the Probation's Officer's Report.   The prisoner's

10     version of this crime is after interviewing Feliciano

11     for this report, he at a timed that his version

12     remains the same as written in the January 1998

13     report.   The report reads as follows:

14          Feliciano stated that he never told

15          Rodriguez to take out the rifle.   He

16          stated that when Rodriguez pulled up

17          in his car, he parked right in front

18          of Feliciano's apartment.   He told –

19          – he told Feliciano that Ms. -- Ms.

20          Hernandez wanted her children back.

21          Feliciano told him that he would not

22          give up the children and told

23          Rodriguez to move his car from in

24          front of his apartment.   He claimed

25          that he told Rodriguez to move his

26          car from in front of his apartment.

27          It's redundant.   He claimed that he

13

1           -- that he told Rodriguez that Mrs.

2           Hernandez could go to the end of the

3           apartment to see her children.  Then

4           he said that Rodriguez refused to

5           move his car so Feliciano went to

6           his apartment, got a 22. Caliber

7           rifle.  It says that he stood in his

8           doorway.  He saw Rodriguez reach

9           down.  He thought Rodriguez was

10          reaching for a relationship, so he

11          claims he fired two rounds not

12          knowing his common-law wife was

13          still in the car.  He did not

14          believe at first that he had killed

15          -- sorry.  I'll back up.  He claims

16          that even when he was arrested, he

17          did not believe at fist that he

18          killed Mrs. Hernandez.  He said he

19          felt badly and was concerned because

20          he knew he was going to jail and

21          that nobody -- and would be nobody

22          to take care of his children.  He

23          said he didn't have any problems

24          with his ex-common law wife and

25          never intended to kill her.

26     There's an indication here of aggregating factors:

27          The victim was particularly Von

14

1          rabble inside the vehicle when

2          Feliciano opened fire with a 22.

3          Caliber automatic rifle, and during

4          the commission of crime, the inmate

5          had a clear opportunity to cease but

6          instead continued.  The inmate was -

7          - had a special relationship of

8          trust with the victim who was his

9          estranged girlfriend and the mother

10         of his children.  In a manner this

11         crime was committed -- created a

12         potential for serious injury to

13         persons other than the victim of the

14         crime.  Mitigating factor: the

15         inmate participated in the crime

16         under partially excusable

17         circumstances alcohol intoxication,

18         which did not -- which did not

19         amount to a legal defense.

20   Okay.  There's no juvenile history, and there is no

21   adult history as for as crime is concerned.  You'd

22   never been in trouble before Mr. Foreman with the law?

23   Okay.  I'm going to read a little at you.  Feliciano

24   is the second of two -- of six children born to and

25   raced by his natural parents in Cuba.  He has a twin

26   brother who was raced in Cuba until he was 28 or 29.

27   Came to the United States via the boatlift from Cuba

15

1   in the early '80s.  He stated that he disliked the

2   communist state and was given an opportunity to by

3   Fidel Castro, so he chose to accept the boatlift

4   process.  Is that correct, sir?

5           INMATE FELICIANO:  Yes, sir.

6           PRESIDING COMMISSIONER SAWYER:  So you were

7   a boat person, huh?

8           INMATE FELICIANO:  Yes, sir.

9           PRESIDING COMMISSIONER SAWYER:  He went

10  through school to the ninth grade and then stated when

11  he was inducted into the Cuban army in 1970s.  He

12  stated that after some repeated discussion he

13  acknowledged that he was in the Cuban army for

14  approximately six months.  He acted strange enough for

15  them to consider him to be crazy and was sent to see a

16  psychiatrist.  He stated that he was placed in a

17  military jail for approximately three months then

18  released.  The record indicated that he simply did not

19  like the military lifestyle or be told what to do.  He

20  stated that simply one day he refused to put his

21  uniform on and began the process that led to his

22  discharge from the army.  Subsequently he worked in a

23  variety of trades including mechanic.  He was first

24  married in 1970 through '74 or '75.  He has one

25  daughter from this union.  His ex-wife and daughter

26  reside in Cuba.  Are they still in Cuba?

27          INMATE FELICIANO:  Yes.

16

1           **PRESIDING COMMISSIONER SAWYER:**  Do you have

2   any contact with them?

3           **INMATE FELICIANO:**  Yes.

4           **PRESIDING COMMISSIONER SAWYER:**  Second

5   relationship was a non-wed union, which lasted for

6   approximately three years, and there are two sons from

7   this relationship and your ex-common law wife and sons

8   remain in Cuban -- in Cuba.  Is that true?

9           **INMATE FELICIANO:**  Yes.

10          **PRESIDING COMMISSIONER SAWYER:**  And are they

11  still there?

12          **INMATE FELICIANO:**  Yes.

13          **PRESIDING COMMISSIONER SAWYER:**  And do they

14  -- do you correspond or do you write to them?

15          **INMATE FELICIANO:**  Yes.  They write me.

16          **PRESIDING COMMISSIONER SAWYER:**  And they

17  write to you?

18          **INMATE FELICIANO:**  Yes.

19          **PRESIDING COMMISSIONER SAWYER:**  The third

20  relationship was a non-wed union to his common-law

21  wife, who was the victim of the incident offense, and

22  there were two sons born in Cuba and one daughter born

23  in the United States from this union.  He has no idea

24  of what their status is at this time.  Since being

25  incarcerated, he is presently married in a lawful

26  union, which occurred during his incarceration in 1990

27  '91.  So you have a wife now?

17

1          **INMATE FELICIANO:**  Yes.

2          **PRESIDING COMMISSIONER SAWYER:**  Okay.  Are

3    you still married?

4          **INMATE FELICIANO:**  Yes.  And you haven't --

5    you're not in touch with your two sons and your

6    daughter that you had with Ms. Hernandez?

7          **INMATE FELICIANO:**  No.

8          **PRESIDING COMMISSIONER SAWYER:**  Not -- not

9    at all.  Although, the record revealed that Feliciano

10   reported drinking six or seven beers prior to the

11   instant offense, he stated he only had two or three

12   beers on that day.  His reaction to the instant

13   offense was that it was a mistake.  When he came to

14   this country, he was immediately -- shipped

15   immediately to New Orleans and then rerouted to San

16   Bernardino County accordingly -- according to the

17   record, he was sent to a refuge camp in Florida and

18   then came to California with a surviving victim and

19   his wife and children and they were released from the

20   refuge camp.  You've worked as an auto mechanic,

21   repair business on an informal basis, and formally you

22   were on public assistance?

23         **INMATE FELICIANO:**  Yes.

24         **PRESIDING COMMISSIONER SAWYER:**  Welfare

25   sometimes called.  You had a brief period where you

26   worked at a Burger King, but that ended in a dispute

27   over a paycheck and taxes and Social Security were

18

1  withheld.  Did you have any other jobs?  Did you do

2  any other than a mechanic and a brief time at Burger

3  King?  Did you do any other kind of work?

4         INMATE FELICIANO:  Yes.

5         PRESIDING COMMISSIONER SAWYER:  Before you

6  came to prison?

7         INMATE FELICIANO:  Yes.

8         PRESIDING COMMISSIONER SAWYER:  What kind of

9  work was that

10        INMATE FELICIANO:  I worked in a motor home

11 making motor homes.

12        PRESIDING COMMISSIONER SAWYER:  Motor homes?

13        INMATE FELICIANO:  In Riverside

14        PRESIDING COMMISSIONER SAWYER:  In

15 Riverside?  What was the name of that company?

16        INMATE FELICIANO:  I don't know the name.

17 It's too long.

18        PRESIDING COMMISSIONER SAWYER:  Okay.

19        INMATE FELICIANO:  It's too long.

20        PRESIDING COMMISSIONER SAWYER:  It was a

21 long time ago?

22        INMATE FELICIANO:  Yes.  Okay.  His future

23 plans include that he would live with his wife.  How

24 do you pronounce your wife's first name?

25        INMATE FELICIANO:  Alejandra.

26        PRESIDING COMMISSIONER SAWYER:  Alejandra,

27 A-L-E-J-A-N-D-R-A, Feliciano in Corcoran California.

19

1           **INMATE FELICIANO:**  No, she lives now in

2   Hanford.

3           **PRESIDING COMMISSIONER SAWYER:**  She lives in

4   Hanford now?

5           **INMATE FELICIANO:**  Yes.  Does she come to

6   visit with you?

7           **INMATE FELICIANO:**  Yes.

8           **PRESIDING COMMISSIONER SAWYER:**  Employment,

9   although he has no firm job offers at this time, it

10  said that he would work in the upholstery field or as

11  on auto mechanic.  He completed his vocational

12  upholstery class, but has no training in auto

13  mechanics since his -- and that's where it ends since

14  his.  Okay.  Incarceration in 1982, nothing in his

15  file to indicate that he has any mechanic skills or

16  training.  His file does include some training and

17  skills as a glassier, so you know how to put glass in?

18          **INMATE FELICIANO:**  Yes.

19          **PRESIDING COMMISSIONER SAWYER:**  You know how

20  to do windows?

21          **INMATE FELICIANO:**  Yes.

22          **PRESIDING COMMISSIONER SAWYER:**  He was in

23  the United states -- this is in the INS status.  He

24  was in the United States for about three years when he

25  committed the instant offense.  He was a boat person

26  from Cuba and he entered the United States via

27  Florida.  An immigration hold was placed on him

```
 1   October 18, 1983, by the San Francisco Office of the

 2   INS.  Okay.  Let's see what kind of support letters

 3   you have here.  This is a letter dated 6/20/of '04.

 4   It's an interpretation of a handwritten letter.

 5           First of all I'm Mrs. Feliciano, the

 6           wife of Pedro Feliciano.  We've been

 7           together 13 years.

 8   She's asking for mercy.

 9           He's had a clean life, clean record.

10           She doesn't worry about her husband

11           work -- not working.  I can take

12           care of that.  She claims here that

13           you are both Christians and Seventh

14           Day Adventists.  She is very

15           supportive and she wants to know

16           when she can pick you up.

17   And that's signed by Alejandra Feliciano.  What kind

18   of work does she do, sir?

19           INMATE FELICIANO:  She's not working right

20   now because she had an accident in the car.

21           PRESIDING COMMISSIONER SAWYER:  Oh.

22           INMATE FELICIANO:  And she can work right

23   now.

24           PRESIDING COMMISSIONER SAWYER:  She can

25   work?

26           INMATE FELICIANO:  No.

27           PRESIDING COMMISSIONER SAWYER:  Was she hurt
```

1    in the accident?

2            **INMATE FELICIANO:**   Yeah.   She hurt her back

3    and she (indiscernible) and they took a little bone in

4    the side --

5            **PRESIDING COMMISSIONER SAWYER:**   Yeah.

6            **INMATE FELICIANO:**   -- from in there.

7            **PRESIDING COMMISSIONER SAWYER:**   Oh --

8            **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

9    Vertebrae.

10           **PRESIDING COMMISSIONER SAWYER:**   Repaired

11   vertebrae?

12           **INMATE FELICIANO:**   Yeah.

13           **PRESIDING COMMISSIONER SAWYER:**   Okay I have

14   another record -- another letter here from the

15   Hanford Bilingual Seventh Day Adventists Church, it

16   says:

17           You're a baptized member and good

18           regular standing at the Seventh Day

19           Adventist Church.  You're a fine man

20           with a good heart.  Believe you have

21           the determination and great desire

22           to be released from prison, has the

23           church family waiting for him upon

24           release and immediately assist him

25           with a job.  This job position would

26           help him earn a living.

27   It doesn't say what kind of job.  What kind offer job

22

1    does your church have for you?

2              **INMATE FELICIANO:**  They have a --

3              **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

4    Construction.

5              **PRESIDING COMMISSIONER SAWYER:**

6    Construction?

7              **INMATE FELICIANO:**  Yeah (indiscernible)

8              **PRESIDING COMMISSIONER SAWYER:**  I'm sorry?

9              **ATTORNEY SPOWART:**  Tell Mr. Zabale.

10             **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

11   They also have a job food service restaurant.

12             **PRESIDING COMMISSIONER SAWYER:**  Okay.  And

13   that's dated May 11, 2004, Antonio Huerta, H-U-E-R-T-

14   A, Pastor of the Hanford Bilingual Seventh Day

15   Adventist Church.  And I have a hand-written note for

16   Art Bricno, B-R-I-C-N-O, Hanford California, dated May

17   14, of '04 employment for Pedro:

18             I'm willing to help Ms. Feliciano

19             who is a member of my church with

20             employment for her husband Pedro.

21             Self-employed building contractor

22             and can hire him 30 to 36 hours per

23             week at minimum wage.  He will start

24             as a trainee/assistant handy man

25             working plumbing, roofing, drywall,

26             painting, clean ups.  I only require

27             a good attitude to have a job.

1          Respectfully, Art Bricno.

2     And that's all the letters.  Commissioner?

3          **DEPUTY COMMISSIONER FILANGERI:**  Thank you,

4     Commissioner Sawyer.  This part of the hearing we're

5     going to talk at your behavior since the last time you

6     appeared before the Board, that was in August of 2002,

7     and you received a two-year denial.  The Board

8     recommended that you remain disciplinary free, up

9     grade vocationally and educationally and participate

10    in self-help programs.  The first document I want to

11    refer to is the correctional counselor's report of

12    August 2004, and unfortunately, I don't have a

13    signature sheet on mine.  Do you have one on yours

14    counselor?

15          **ATTORNEY SPOWART:**  Sure don't.

16          **DEPUTY COMMISSIONER FILANGERI:**  The -- and

17    the prost-conviction progress report doesn't have a

18    correctional counselor signature either, so we don't

19    know who author of this is.

20          **PRESIDING COMMISSIONER SAWYER:**  Who is your

21    counselor?

22          **INMATE FELICIANO:**  (Indiscernible)

23          **PRESIDING COMMISSIONER SAWYER:**  Who?  Who

24    wrote this?

25          **INMATE FELICIANO:**  I change counselors all

26    the time.  (Indiscernible)

27          **DEPUTY COMMISSIONER FILANGERI:**  That's okay.

24

1    It's okay.  The record will just reflect we don't know

2    who the counselor was.  Under post-conviction factors

3    counselor points out that there's been participation

4    in therapy and self-help programs.  The 12-week

5    (indiscernible) Anger Management and the Life Skills

6    Program.  He also attended a nine-week Impact Program,

7    but you were unable to complete it due to your

8    transfer to CTF Central.  Shows Chronos for AA and NA

9    as a contributing member.  Disciplinary history has

10   been clear.  In fact your last disciplinary was in

11   1984 where a cell search revealed a weapon in the

12   toilet.  The weapon was a stick with a -- with a razor

13   blade on it.  The cell was occupied -- occupied by you

14   and another inmate.  There was also a failure to

15   report to school.  So for over 20 years there have

16   been no disciplinaries.  Your last negative Chrono was

17   1995 for non-excused absence.  The next document I

18   want to consider is the psychiatric report.  I should

19   have mentioned that your case was placed on the

20   calendar in 2004, but postponed because the psych

21   report was too old.  This report was written in

22   October of 2004, signed by Joe Reed, R-E-E-D, Ph.D.

23   Staff Psychologist.

24            **PRESIDING COMMISSIONER SAWYER:**  Let's --

25   we're going to go off the record and take a recess

26   just for a second to get our teleconference in order

27   here.  Go off the record.

25

```
1                    [Off the record]
2           DEPUTY COMMISSIONER FILANGERI:  Okay.  We're
3  back on.  Don't turn it off just -- sir, I was
4  referring to the psychiatric report of item 14, the
5  assessment of dangerousness the examiner thought there
6  was the risk for violent behavior within the
7  controlled setting was considered to be low relative
8  to the level two inmate population in the prison
9  setting it says based on two factors including
10 psychological instructs.  The HRC20 suggests a low
11 risk of violence relative to the inmate population in
12 the prison setting as well as within the community and
13 the HARE Psychologist checklist, short version,
14 suggested did not suggest the presence of sociopath.
15 If released for the community the risk for violence is
16 to be that of the average citizen in the community.
17 Clearly the main observations the inmate is competent
18 and responsible for his behavior and he has the
19 capacity to abide by institutional standards.  The
20 inmate does not have a mental health disorder.  In
21 looking through your file, the last vocational
22 certificate I saw for completion was Vocational
23 Upholstery, is that right? ?
24          INMATE FELICIANO:  Yes, sir.
25          DEPUTY COMMISSIONER FILANGERI:  That was
26 1995?
27          INMATE FELICIANO:  Yes, sir.
```

```
 1              DEPUTY COMMISSIONER FILANGERI:  Since then
 2    you've had various jobs.  Now you're working as a
 3    barber?
 4              INMATE FELICIANO:  Yes, sir.
 5              DEPUTY COMMISSIONER FILANGERI:  That's
 6    confirmed by a addendum post-conviction progress
 7    report submitted August 2005.  It suggest that they
 8    were no work performance reports, however, I thought
 9    saw one in the file that was twos and threes.  Yes,
10    that was submitted February 8, 2005, generally above
11    average and average marks.  This is a counselor whose
12    name I cannot make out in the signature.  It says
13    there's been no vocational training, no academics.
14    The group activities were not noted, no psych
15    treatment.  I saw an indication that you were
16    participating in Adult Basic Education?  The last
17    Chrono there was 1993, at that point they thought that
18    you would be able to pass the GED in six months, but I
19    didn't see any GED.  Would you care to comment on
20    that?
21              INMATE FELICIANO THROUGH INTERPRETER ZEBALE:
22    I haven't taken my GED.  My eyesight problem prevents
23    me from doing that.
24              DEPUTY COMMISSIONER FILANGERI:  All right.
25    How about any other vocational training?
26              INMATE FELICIANO THROUGH INTERPRETER ZEBALE:
27    I can't do any vocations here because I'm unable to
```

1    use state boots.  I have to use tennis shoes.

2            **DEPUTY COMMISSIONER FILANGERI:**  They wont

3    allow you to use tennis shoes?

4            **INMATE FELICIANO:**  No.

5            **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

6    For safety reasons, they won't let you go through east

7    gate.

8            **DEPUTY COMMISSIONER FILANGERI:**  So your

9    vision prevents you from going to educational

10   training, and your shoes prevent you from going to

11   vocational training?

12           **INMATE FELICIANO:**  Yes, sir.

13           **DEPUTY COMMISSIONER FILANGERI:**  All right.

14   Is will anything else you think we should put on the

15   record at this point about your behavior since the

16   last time you were here?  Back to you Commissioner

17   Sawyer.

18           **PRESIDING COMMISSIONER SAWYER:**  Thank you.

19   Counsel, do you have any questions for the inmate.

20           **ATTORNEY SPOWART:**  No, I have no questions.

21           **PRESIDING COMMISSIONER SAWYER:**  Do you have

22   any additional questions, Commissioner?

23           **DEPUTY COMMISSIONER FILANGERI:**  No.  No, he

24   doesn't want to talk about the crime offense.  No

25   other questions.

26           **PRESIDING COMMISSIONER SAWYER:**  Would you

27   like to close?

28

1          **ATTORNEY SPOWART:**  Yes.  Mr. Feliciano,

2    pardon me.  He's 53 years old today.  He was 29 years

3    old at the time of the crime.  He had come from Cuba

4    with his common-law wife, who was the victim, with her

5    children and on a boatlift.  They had lived together

6    for quite a number of years.  At the time of the crime

7    he didn't talk about it, but it is a part of the crime

8    and I would like you to look at page -- I can't see

9    the page -- oh, page 2 of the Probation Officer's

10   Report where it talks about circumstances leading up

11   to the life crime and this is in the record, so I'm

12   going to address it.  As far as he was concerned, he

13   was getting a long fine, he and his wife, and then one

14   night or one day she doesn't show up and she was going

15   out to go to the store or something and she didn't

16   come back and then somebody tells her -- well she's

17   left.  The other individual that was sitting in the

18   car at the time of the crime supposedly was Mr.

19   Feliciano's friend.  In actuality, he had been having

20   a relationship with the wife.  He told him, Mr.

21   Feliciano, well eventually he told him that she was

22   living with him, and now -- when she left initially,

23   she took the children are him -- her, but then she

24   brought the children and left them with him, my

25   client.  She just said they're yours take care of

26   them.  Sometime after that, this -- her boyfriend

27   calls and says -- she had -- in the meantime she had

29

1    visits the children but then after that the boyfriend
2    calls him and says she wants the children back and Mr.
3    -- my client was concerned about the children, and he
4    says no she can come and visit them, but she can't
5    take the children back, you know, until -- she had
6.   given them to him, so this -- this is what sets the
7    scene for that day. And now this is not an excuse,
8    but you understand -- if you look at Title 16
9    Administrative Code that sets up these hearing and it
10   says what you look at to understand the situation if
11   something had developed over a period of time in which
12   this had puts a great amount of stress on an
13   individual which this certainly did, this involved in
14   children, his wife, his so-called friend, you can
15   understand his feelings and emotions. And this goes
16   to the very important fact that when we're looking at
17   an inmate here we want to know does he pose an
18   unreasonable risk of danger to society in general, you
19   know, is he the kind of a guy that walks into a 7-
20   Eleven blows away a clerk and for 10 or $15. No that
21   was never -- my client had been a gentleman all of his
22   life. He has tried to live a good life. This was a
23   period of stress. He acted irrationally. There was
24   no excuse for it. He certainly did not intend to kill
25   his wife, and I'll get to that in a second when I
26   cover the psych report, but I -- I just want you to
27   set the stage of how it came about. Is he given the

30

1   circumstances highly unlikely to ever recur again and
2   based on his age a chance of recidivism are low.  He
3   had no juvenile record.  Born in Cuba, raised -- was
4   in the Cuban army didn't like it and managed to
5   convince him that he wasn't a good prospect for the
6   Cuban army and got out and the first chance he had to
7   get out of Cuba, he took it.  Took his wife for a
8   better life.  As far as the motivation, it was an
9   argument in stress.  Adult record was an instant
10  offense only, so we're not looking at a man who had a
11  long period of criminal activity, he did not.  We're
12  not looking at a man whose a potential danger to the
13  average person on the street, he is not.  This was a
14  particular set of circumstances highly unlikely to
15  ever recur.  He has expressed remorse to the psych,
16  and I'll address that at the time.  He has good parole
17  plans.  He has a place to live.  He has a job offer.
18  Institutional adjustment is very good.  He has 2115s
19  and those are back in '84 and has commissioner said
20  that was over 20 years ago.  Six -- 128A, the last one
21  in '99, which was a decade ago.  None of them had
22  involved violence.  He has job -- he has an INS hold.
23  Now, he's how I can figure when it comes to Cuba, we
24  had discussed this with other Board members in the
25  past Cubans.  It doesn't seem like -- they do actually
26  send them back to Cuba.  They usually take them to
27  some kind of a holding process and what happens to

1    them after that, I don't know, but he does have job
2    offers and a job a place to live here in the states
3    and that is with his wife.  Since his last hearing,
4    he's done everything the Board asked him.  He can't
5    get a vocation, he physically can do it.  He can't
6    upgrade educationally because of his eyes.  He has
7    been in AA, got laudatory Chronos.  Essentially, he's
8    done everything the Board has asked him to do,
9    everything he can do and based on the circumstances of
10   the offense, his lack of prior criminal history --
11   now, at this point I want to go over the psych report.
12   The course diagnostic impressions, this is a clinical
13   assessment.  Axis I, no contributory clinical disorder
14   and Axis II, no personality disorder in addition to
15   regularly attending Narcotic's Anonymous.  Inmate
16   Feliciano completed initial nine weeks of Impact Group
17   in 2002, before moving to another facility.  In 19 --
18   in 2002, he completed the Muslim Development and
19   Centers Anger Management Course.  In April 1999, he
20   completed the Muslim Islamic Addiction Recovery
21   program, a 12-week seminar series.  It should also be
22   noted that in 1995 he updated a TABE reading score of
23   12.9, which shows that when he could, he did study,
24   did try to bring up his educational level.  When you
25   get to 12.9 that would actually qualify him easily for
26   a vocational course accept physically, he can't do it.
27   Under view of the life crime --

32

1          **DEPUTY COMMISSIONER FILANGERI:**  Excuse me.

2                    [Off the record]

3          **DEPUTY COMMISSIONER FILANGERI:**  This is side

4     two of the tape-recorded hearing transcript of Mr.

5     Pedro Feliciano, F-E-L-I-C-I-A-N-O, C-59854.  Sorry

6     for the interruption.  Go ahead Counselor.

7          **ATTORNEY SPOWART:**  Under review of the life

8     crime the last paragraph Inmate Feliciano observed

9     that the death was a tragedy and it was appropriate

10    for him to use his firearm.  He demonstrated empathy

11    think for the damage done to the victims including his

12    ex-wife, her boyfriend, and his three children.  He

13    seems generally penitent for his crime and appears to

14    understand the causative factors leading to the

15    instant offense.  He seems committed to never using

16    violence to solve problems again.  Then what we really

17    want to know is what the psychologist assessment of

18    his dangerousness to society, because that's basically

19    why we're here today.  Well, it is why we're here

20    today.  His risk for violent behavior when in the

21    controlled setting is considered to be low relative to

22    this level to inmate population and a prison setting,

23    and then he says this conclusion is based on several

24    factors which he goes on to list.  During the

25    interview two psychological instruments were also

26    administered results from the ACR20 suggest a low risk

27    of violence relative to the inmate population in both

33

1     the prison setting and within the community.  Results

2     of a HARE Sociopathy Checklist short version do not

3     suggest the presences of a sociopathy.  Therefore in

4     light of this - these factors, his risk of violence is

5     considered to be low relative to inmate population and

6     this inmate population here is a level two is low to

7     begin with.  If released to the community clinically

8     assessed his risk for violence is expected to be

9     average to that of average citizen in the community.

10    There are no significant risk factors or precursors to

11    violence for this individual.  And if you look at his

12    life before this -- this terrible crime for which he

13    is paying -- he is paying.  You'll see that nowhere in

14    the past has there been violence.  He wanted to get

15    out of the army.  He didn't -- he just wanted to live

16    a life.  He wanted to come to the states to live a

17    better life.  This -- this was stress built up over a

18    period of time that caused an irrational reaction, and

19    the psych evaluating him now said he's -- does not

20    present a problem.  Clinical observations comment and

21    recommendations he talks about this inmate -- this

22    inmate does have a significant alcohol abuse history

23    as it was related to the instant offense, however, he

24    has adequately completed a number of alcoholic

25    anonymous groups over the years.  It is only suggested

26    that he participate in one year of Alcohol Anonymous

27    group during parole.  And that the single and only

1   thing the psych had to say otherwise he was absolutely

2   a positive, and based on his record -- I can only

3   submit it and based on the record and the psych and

4   ask that a finding of suitability be made today.

5           **PRESIDING COMMISSIONER SAWYER:**   Thank you,

6   Counsel.   Mr. Feliciano, this is your opportunity to

7   tell us why either you think you're suitable for

8   parole.

9           **INMATE FELICIANO THROUGH INTERPRETER ZEBALE:**

10   I think I'm entitled to another opportunity.   He says

11   this is the first time in my life where I committed a

12   crime and made a mistake.   And I know I'm older now

13   and I'm more experienced, and I'm not -- I'll be

14   living with my wife now.   Or my family and much less

15   the government to give me this opportunity.   I

16   acknowledge that I am guilty for what I did and what I

17   did was very wrong.   I apologize more than anyone for

18   the children for the accident or non-accident where I

19   took their mother's life away and I also ask that for

20   an apology for forgiveness for the authorities of this

21   country for the crime that I committed.   Nowadays, I

22   have God in my heart and I leave it all entirely in

23   God's hand -- hands who knows me more than anyone and

24   that's it.

25           **PRESIDING COMMISSIONER SAWYER:**   Okay.   Thank

26   you very much.   The time is 9:41 a.m. and we will be

27

35

1   recessing for deliberation.//

2                    **R E C E S S**

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

36

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER FILANGERI:**    We're

4    on record.

5    **PRESIDING COMMISSIONER SAWYER:**    Okay.    The

6    time is 10:09 in the matter of Pedro Feliciano.    The

7    panel's reviewed all information received from the

8    public and relied on the follow circumstances in

9    concluding that the prisoner is not suitable for

10    parole and would pose an unreasonable risk of danger

11    to society or threat to public safety if released from

12    prison.    The offense was carried out in an herbally

13    callous manor.    On June 15, 1982 Mr. Rodriguez and Ms.

14    Hernandez, the estranged wife of Pedro Feliciano,

15    pulled up in front of his apartment.    There was a

16    conversation, Mr. Feliciano went inside of his

17    apartment came out -- or came into the doorway brought

18    a rifle a 22. Caliber automatic rifle from his house,

19    stood in the doorway fired two to four shots in the

20    direction of the victim striking Rodriguez in the neck

21    and Mrs. Hernandez -- Ms. Hernandez, his estranged

22    wife, in the head.    Subsequently, Mr. Rodriguez was

23    injured -- was able to drive away out of harm's way

24    and Ms. Hernandez was pronounced dead at the

25    Loma Linda Medical Center.    That's particularly

26    callous and was clearly carried out in a

27    **PEDRO FELICIANO C-59854 DECISION PAGE 1 8/31/05**

37

1  dispassionate calculated manner.  Mr. Rodriguez
2  -- Mr. Feliciano did not talk to us about the
3  crime, and we had questions certainly that would
4  have given us a little more insight into what he
5  was thinking at the time.  Although, there's an
6  indication that he had been drinking with two
7  different reports that he was drinking at the4
8  time of the offence.  He was -- two to four
9  shots into the car not knowing what was behind
10  that car.  It was an apartment building,
11  certainly was a definite hazard to other people
12  driving by or walking other houses -- the
13  offense was carried out in a manner, which
14  demonstrates an exceptional callous disregard
15  for the safety of others.  The motive in the
16  crime was trivial.  There was a disagreement.
17  There was an estrangement here that needed to be
18  worked out in court.  It needed to be worked out
19  between you and Mrs -- Mr. Feliciano and Ms.
20  Hernandez if there was going to be a separation
21  or there may have been a separation at that time
22  the three children were the most important part
23  of this and their safety of course was the most
24  important part of this but they -- this needed
25  to be worked out in court in a court of law As
26  opposed to being taken -- Mr. Feliciano taking
27  **PEDRO FELICIANO C-59854 DECISION PAGE 2 8/31/05**

1    this into his own hands, and he was obviously

2    very upset about the fact that Mr. Rodriguez and

3    Ms. Feliciano -- or Ms. Hernandez came back to

4    see the children.  He has no previous record.

5    For the period of time 22 years that he's been

6    in custody he has -- he is limited in a -- has

7    programmed in a limited manner given the fact

8    that he has eye and feet limitations in terms of

9    being able to read and being able to work.  He

10   claims he can't work because of he has to wear

11   tennis shoes and can't wear boots as is required

12   to be to work in the trades.  Very limited on

13   marketable skills right -- currently he is a

14   barber.  He has performed upholstery up until

15   1995.  He's had 22 years to get his GED and he

16   has not completed that claiming that because of

17   his eye problem he hasn't been able to do that.

18   It's not -- he's -- he has been in some self-

19   help and therapy programs.  He's been

20   discipline-free since 1995 on his 128s and 1984

21   on his 115s.  He only had two 115, six,128s.  He

22   had -- his psychological October 26, of '04, Dr.

23   Reed says that he's a low risk of violence in

24   custody and an average risk in the community.

25   I'm a little troubled by his parole plans.  He

26   does have a wife that lives in Hanford

27   **PEDRO FELICIANO C-59854 DECISION PAGE 3 8/31/05**

1  California that she indicates in a letter that

2  she would -- he could move in with her.  That's

3  not troubling.  The troubling part is that he

4  has a job offer but it's in construction, and

5  I'm sure that he's going to have to wear boots

6  if he's going to work in the construction

7  trades, and so that whether that -- whether he's

8  motivated to wear boots in the  -- upon release

9  or whether he's -- he may not be able to do

10  construction trades.  He has marketable skill.

11  Again, he did complete upholstery in 1995, 10

12  years ago, and currently he's doing barbering

13  work, which is a marketable skill.  We'd like to

14  see Mr. Feliciano be a little more motivated in

15  trying to work on his self-help and vocational

16  areas.  Again, I'll make note that there are

17  limitations.  He should be commended for his

18  laudatory recovery AA and NA laudatory Chronos,

19  the Impact Program, Anger Management Program.

20  These are all very positive steps for his

21  future.  However, these aspects do not outweigh

22  the factors of unsuitability and we recommend

23  two years.  Commissioner, do you have anything

24  you'd like to say?

25          **DEPUTY COMMISSIONER FILANGERI:**  Yes,

26  thank you Commissioner, I do.  I want to

27  **PEDRO FELICIANO C-59854 DECISION PAGE 4 8/31/05**

40

1   certainly make note of the prisoner's recent

2   participation in self-help, that's good.

3   Vocational educational participation, however,

4   has been nonexistent for about a decade.  Of

5   course this is due to prisoner's limitations.

6   Counsel relied on a passage from the psych

7   report to conclude the prisoner is genuinely

8   remorseful over the Commitment Offence, but his

9   remarked at the DPT in 2000 the last time he

10  chose to comment on the Commitment Offence it

11  sounds like he's more sorry about the impact the

12  crime has had on him rather than feeling

13  genuinely remorseful.  I'd like the quote the

14  parole suitability hearing of August 21, 2000

15  from page 16 beginning on line five:

16          Presiding Commissioner Bardinaro

17          (phonetic) "okay how do you feel

18          about this crime now?" Inmate

19          Feliciano, "this is too bad"

20          (indiscernible) "because, you

21          know, I lose everything.  I lose

22          my life, I lose my kids.  I lose

23          everything, you know.  Because

24          when you lose one kid it's too

25          hard for your heart, you know.

26          You lose three it's very, very

27  **PEDRO FELICIANO C-59854 DECISION PAGE 5 8/31/05**

1       hard.  You lose your family use

2       lose everything.  In this

3       moment, you know, I try

4       protecting my kids, you know,

5       because this – this woman you

6       know I know I make these

7       consequence.  I no do nothing."

8       Presiding Commissioner Bardinaro

9       "what about your wife?  When I

10      asked you how you feel about the

11      crime you didn't even mention

12      your wife?  Inmate Feliciano,

13      "my wife."  Presiding

14      Commissioner Bardinaro "the one

15      -- Inmate Feliciano, "Lazarra"

16      Presiding Commissioner Bardinaro

17      "yeah the one that you killed?"

18      Inmate Feliciano, "I don't have

19      any trouble she -- she and me is

20      okay, you know, she is, you

21      know, take a decision, leave it.

22      It's okay, you know."

23  Counsel also suggest the Commitment Offence was

24  a result of a particular set of circumstances

25  that are unlikely to be repeated in the future,

26  but there simply are too many unanswered

27  **PEDRO FELICIANO C-59854 DECISION PAGE 6 8/31/05**

42

1  questions about the Commitment Offence for me to

2  conclude that the prisoner's release would not

3  pose a threat to public safety at this time,

4  thank you.

5            **PRESIDING COMMISSIONER SAWYER:**  Thank

6  you.

7            **ATTORNEY SPOWART:**  Commissioner, before

8  we close at this point and time I want to state

9  for the record that my client did not get a fair

10 hearing.  He has a right not to have to talk

11 about the life crime.  It's all in the record

12 and you stated that in your -- one of the things

13 you stated clearly on the record that you wanted

14 to be able to talk to him at the life crime.

15 Now, you aggregated his right.  He did not have

16 a fair hearing so I object to this hearing.

17           **PRESIDING COMMISSIONER SAWYER:**

18 Counsel, it certainly is your client's right to

19 not talk about the Commitment Offence.  You use

20 the record in providing your conclusions.  We

21 went back to the record.  In looking to answer

22 some questions that we have about the commit

23 offense.  Your clients not being disadvantaged

24 because he didn't talk about the Commitment

25 Offence, I'm saying in my statement I have too

26 many questions about the Commitment Offence to

27 **PEDRO FELICIANO C-59854 DECISION PAGE 7 8/31/05**

43

1   conclude that the prisoner's release would not

2   pose an unreasonable risk to public safety.  I

3   have the questions.  Whether your client chose

4   to talk about the Commitment Offence or not, I

5   still have the questions --

6          **ATTORNEY SPOWART:**  I'm not talking

7   about your comments, Commissioner.  I'm talking

8   Commissioner Sawyer's comments, who stated right

9   on there, we wanted to talk to him about the

10   life crime.  Well, you can't have it both ways.

11   You can't say well you have a right not to talk

12   about it but then come out and say well you've

13   been denied for two years because we wanted to

14   talk to you about the life crime --

15          **DEPUTY COMMISSIONER FILANGERI:**  I'm

16   sorry -- well go ahead you wanted to make a

17   comment.

18          **ATTORNEY SPOWART:**  No.  I'll leave.

19   I'll leave it.  I'll leave it alone.

20          **PRESIDING COMMISSIONER SAWYER:**  We

21   recommend in this case that no more 115s, 128s.

22   Get self-help, stay disciplinary free learn a

23   trade if possible and earn positive Chronos.

24

25

26

27   **PEDRO FELICIANO C-59854 DECISION PAGE 8 8/31/05**

1    That concludes this hearing.//

2                    --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED TWO YEARS**

24    **THIS DECISION WILL BE FINAL ON:Dec 29, 2005**

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **PEDRO FELICIANO C-59854 DECISION PAGE 9 8/31/05**

45

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, FELICIS TOWNSEND, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 44, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, at SOLEDAD CITY, CALIFORNIA, in the matter

of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF

PEDRO FELICIANO, CDC NO. C-59854, ON AUGUST 31, 2005,

and that the foregoing pages constitute a true,

complete, and accurate transcription of the

aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated , OCTOBER 3, 2005, at Sacramento,

California.



*Felicia Townsend*

FELICIA TOWNSEND
TRANSCRIBER
**PETERS SHORTHAND REPORTING**